# EXHIBIT "1"

| State of Alabama<br>Unified Judicial System<br>Form C-34 Rev 6/88 | SUMMONS<br>- CIVIL - | Case Number:<br>03-CV-2012-901037.00 |
|---|---|---|

## IN THE CIVIL COURT OF MONTGOMERY, ALABAMA
### FEDERAL DEPOSIT INSURANCE CORPORATION V. COUNTRYWIDE SECURITIES CORP E

NOTICE TO CWMBS, INC., THE CORPORATION TRUST CO 1209 ORANGE STREET, WILMINGTON, DE 19801

THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE REQUIRED TO FILE THE ORIGINAL OF YOUR WRITTEN ANSWER, EITHER ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT WITH THE CLERK OF THIS COURT. A COPY OF YOUR ANSWER MUST BE MAILED OR HAND DELIVERED BY YOU OR YOUR ATTORNEY TO THE OPPOSING PARTY'S ATTORNEY DENNIS R. BAILEY

WHOSE ADDRESS IS P.O. BOX 270, MONTGOMERY, AL 36101

THE ANSWER MUST BE MAILED WITHIN 30 DAYS AFTER THIS SUMMONS AND COMPLAINT WERE DELIVERED TO YOU OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT.
TO ANY SHERIFF OR ANY PERSONNEL AUTHORIZED by the Alabama Rules of the Civil Procedure:

☐ You are hereby commanded to serve this summons and a copy of the complaint in this action upon the defendant

☑ Service by certified mail of this summons is initiated upon the written request of   FEDERAL DEPOSIT INSURANCE
   pursuant to the Alabama Rules of the Civil Procedure   CORPORATION

| 8/10/2012 3:28:49 PM | /s FLORENCE CAUTHEN | |
|---|---|---|
| Date | Clerk/Register | By |

| ☑ Certified mail is hereby requested | /s DENNIS R. BAILEY |
|---|---|
| | Plaintiff's/Attorney's Signature |

RETURN ON SERVICE:

☐ Return receipt of certified mail received in this office on _____

☐ I certify that I personally delivered a copy of the Summons and Complaint to _____

_____ in _____ County, Alabama on _____

_____   _____
Date   Server's Signature

| State of Alabama<br>Unified Judicial System<br><br>Form ARCiv-93 Rev.6/99 | **COVER SHEET**<br>**CIRCUIT COURT - CIVIL CASE**<br>(Not For Domestic Relations Cases) | Case Number:<br>03-CV-201<br><br>Date of Filing:<br>08/10/2012 | ELECTRONICALLY FILED<br>8/10/2012 3:28 PM<br>CV-2012-901037.00<br>CIRCUIT COURT OF<br>MONTGOMERY COUNTY, ALABAMA<br>FLORENCE CAUTHEN, CLERK |

## GENERAL INFORMATION

### IN THE CIRCUIT OF MONTGOMERY COUNTY, ALABAMA
### FEDERAL DEPOSIT INSURANCE CORPORATION v. COUNTRYWIDE SECURITIES CORP ET AL

**First Plaintiff:** ☐ Business ☐ Individual  **First Defendant:** ☑ Business ☐ Individual
☑ Government ☐ Other  ☐ Government ☐ Other

### NATURE OF SUIT:

**TORTS: PERSONAL INJURY**

☐ WDEA - Wrongful Death
☐ TONG - Negligence: General
☐ TOMV - Negligence: Motor Vehicle
☐ TOWA - Wantonness
☐ TOPL - Product Liability/AEMLD
☐ TOMM - Malpractice-Medical
☐ TOLM - Malpractice-Legal
☐ TOOM - Malpractice-Other
☐ TBFM - Fraud/Bad Faith/Misrepresentation
☐ TOXX - Other: _____

**TORTS: PERSONAL INJURY**

☐ TOPE - Personal Property
☐ TORE - Real Property

**OTHER CIVIL FILINGS**

☐ ABAN - Abandoned Automobile
☐ ACCT - Account & Nonmortgage
☐ APAA - Administrative Agency Appeal
☐ ADPA - Administrative Procedure Act
☐ ANPS - Adults in Need of Protective Services

**OTHER CIVIL FILINGS (cont'd)**

☐ MSXX - Birth/Death Certificate Modification/Bond Forfeiture
Appeal/Enforcement of Agency Subpoena/Petition to
Preserve
☐ CVRT - Civil Rights
☐ COND - Condemnation/Eminent Domain/Right-of-Way
☐ CTMP-Contempt of Court
☐ CONT-Contract/Ejectment/Writ of Seizure
☐ TOCN - Conversion
☐ EQND- Equity Non-Damages Actions/Declaratory
Judgment/Injunction Election Contest/Quiet Title/Sale For
Division
☐ CVUD-Eviction Appeal/Unlawful Detainer
☐ FORJ-Foreign Judgment
☐ FORF-Fruits of Crime Forfeiture
☐ MSHC-Habeas Corpus/Extraordinary Writ/Mandamus/Prohibition
☐ PFAB-Protection From Abuse
☐ FELA-Railroad/Seaman (FELA)
☐ RPRO-Real Property
☐ WTEG-Will/Trust/Estate/Guardianship/Conservatorship
☐ COMP-Workers' Compensation
☑ CVXX-Miscellaneous Circuit Civil Case

**ORIGIN:** F ☑ INITIAL FILING   A ☐ APPEAL FROM   O ☐ OTHER
DISTRICT COURT

R ☐ REMANDED   T ☐ TRANSFERRED FROM   _____
OTHER CIRCUIT COURT

**HAS JURY TRIAL BEEN DEMANDED?** ☑ Yes ☐ No

**RELIEF REQUESTED:** ☑ MONETARY AWARD REQUESTED ☐ NO MONETARY AWARD REQUESTED

**ATTORNEY CODE:** BAI028    8/10/2012 3:27:15 PM    /s/ DENNIS R. BAILEY

**MEDIATION REQUESTED:** ☐ Yes ☐ No ☑ Undecided

ELECTRONICALLY FILED
8/10/2012 3:28 PM
CV-2012-901037.00
CIRCUIT COURT OF
MONTGOMERY COUNTY, ALABAMA
FLORENCE CAUTHEN, CLERK

## IN THE CIRCUIT COURT OF
## MONTGOMERY COUNTY, ALABAMA

| | |
|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR COLONIAL BANK, a domestic banking corporation, <br><br> Plaintiff, <br><br> v. <br><br> COUNTRYWIDE SECURITIES CORPORATION, a corporation; CWALT, INC., a corporation; CWMBS, Inc., a corporation; COUNTRYWIDE FINANCIAL CORPORATION, a corporation; BANK OF AMERICA CORPORATION, a corporation; CITIGROUP GLOBAL MARKETS INC., a corporation; CREDIT SUISSE SECURITIES (USA) LLC, a limited liability company; J.P. MORGAN SECURITIES LLC, a limited liability company; MORGAN STANLEY & CO. LLC, a limited liability company; RBS SECURITIES INC., a corporation; and UBS SECURITIES LLC, a limited liability company; <br><br> Defendants. | Civil Action No. <br> _____ <br><br> **JURY TRIAL DEMANDED** |

## COMPLAINT

Comes now Plaintiff Federal Deposit Insurance Corporation as Receiver for Colonial Bank for its Complaint against Countrywide Securities Corporation (**Countrywide Securities**); CWALT, Inc. (**CWALT**); CWMBS, Inc. (**CWMBS**); Countrywide Financial Corporation (**CFC**); Bank of America

Corporation   (**BAC**);   Citigroup   Global   Markets   Inc.
(**Citigroup**); Credit Suisse Securities (USA) LLC (formerly
known as Credit Suisse First Boston LLC and referred to in
this Complaint as **Credit Suisse**); J.P. Morgan Securities
LLC (formerly known as Bear, Stearns & Co. Inc. and
referred to in this Complaint as **Bear Stearns**), which is
the successor by merger to J.P. Morgan Securities Inc. (in
that capacity referred to in this Complaint as **JP Morgan**);
Morgan Stanley & Co. LLC (formerly known as Morgan Stanley
& Co. Inc. and referred to in this Complaint as **Morgan
Stanley**); RBS Securities Inc. (formerly known as Greenwich
Capital Markets, Inc. and doing business as RBS Greenwich
Capital, and referred to in this Complaint as **RBS**); and UBS
Securities LLC (**UBS**), and alleges as follows:

## I.   NATURE OF THIS ACTION

1.    This is an action for damages caused by violation
of the Alabama Securities Act (**ASA**) and the Securities Act
of 1933 (**1933 Act**) by the defendants. As alleged in detail
below, defendants issued, underwrote, or sold 11 securities
known as "certificates," which were backed by collateral
pools   of   residential   mortgage   loans   in   eight
securitizations.    Colonial    Bank    (**Colonial**)    paid
approximately $283 million for the 11 certificates. When
they issued, underwrote, or sold the certificates, the
defendants made numerous statements of material fact about
the certificates and, in particular, about the credit
quality of the mortgage loans that backed them. Many of

2

those statements were untrue. Moreover, the defendants omitted to state many material facts that were necessary in order to make their statements not misleading. For example, the defendants made untrue statements or omitted important information about such material facts as the loan-to-value ratios of the mortgage loans, the extent to which appraisals of the properties that secured the loans were performed in compliance with professional appraisal standards, the number of borrowers who did not live in the houses that secured their loans (that is, the number of properties that were not primary residences), and the extent to which the entities that made the loans disregarded their own standards in doing so.

2.  Based on an analysis of a random sample of the loans that backed the certificates that Colonial purchased, the defendants made such untrue or misleading statements about at least the following numbers of loans.

3

| Securitization No.[1] | Number of Loans about which Defendants Made Material Untrue or Misleading Statements[2] | Number of Loans that Backed the Certificates | Percentage of Loans about which Defendants Made Material Untrue or Misleading Statements |
|---|---|---|---|
| 1 | 3,274 | 4,833 | 67.7% |
| 2 | 430 | 739 | 58.2% |
| 3 | 927 | 1,791 | 51.8% |
| 4 | 389 | 572 | 68.0% |
| 5 | 1,706 | 2,594 | 65.8% |
| 6 | 3,941 | 6,357 | 62.0% |
| 7 | 2,080 | 3,070 | 67.8% |
| 8 | 572 | 832 | 68.8% |

3.   The   certificates   are   "securities"   within   the
meaning of the ASA and the 1933 Act. The defendants are
liable under the following provisions of the ASA and the
1933 Act:

---

[1]   Colonial   purchased   two   certificates   in
Securitization No. 2, two certificates in Securitization
No. 4, and two certificates in Securitization No. 5.

[2]   The method of random sampling that Plaintiff used
ensures that conclusions about the entire collateral pool
have a margin of error of no more than plus or minus 5% at
a confidence level of 95% (that is, one can be 95% certain
that the true percentage in the collateral pool as a whole
is within 5% of the percentage measured in the sample). For
example, one can be 95% certain that the number of loans in
Securitization No. 1 about which defendants made untrue or
misleading statements or omissions is within 5% of 3,274,
that is, between 3,110 and 3,438. The same margin of error
should be applied to all information in this Complaint and
accompanying Schedules that is based on a random sample of
loans in a collateral pool.

4

*As issuers:* The following defendants, which issued the certificates that Colonial purchased, are liable as "issuers" under Section 11 of the 1933 Act: CWALT, which issued ten of the certificates; and CWMBS, which issued one of the certificates.

*As underwriters:* The following defendants, which underwrote the certificates that Colonial purchased, are liable as "underwriters" under Section 11 of the 1933 Act: Bear Stearns, which underwrote one of the certificates; UBS, which underwrote three of the certificates; Countrywide Securities, which underwrote four of the certificates; Morgan Stanley, which underwrote six of the certificates; and Citigroup, Credit Suisse, JP Morgan, and RBS, each of which underwrote two of the certificates.

*As sellers:* The following defendants, which sold the certificates to Colonial, are liable as "sellers" under Section 8-6-19(a)(2) of the ASA and Section 12(a)(2) of the 1933 Act: Citigroup, which sold two of the certificates; RBS, which sold two of the certificates; and Credit Suisse, Morgan Stanley, and UBS, each of which sold one of the certificates.

CWALT is also liable as a seller under Section 8-6-19(a)(2) of the ASA and Section 12(a)(2) of the 1933 Act because it issued seven of the certificates that Colonial purchased when they were initially offered to the public.

*As control person:* CFC is liable as a "controlling person" of CWALT, CWMBS, and Countrywide Securities under

Section 8-6-19(c) of the ASA and Section 15 of the 1933 Act.

*As successor:* BAC is liable as the successor to each of Countrywide Securities, CWALT, CWMBS, and CFC.

## II.  PARTIES

4.   The Federal Deposit Insurance Corporation (**FDIC**) is a corporation organized and existing under the laws of the United States of America. Under the Federal Deposit Insurance Act, the FDIC is authorized to be appointed as receiver for failed depository institutions. On August 14, 2009, the FDIC was duly appointed the receiver for Colonial. Under the Federal Deposit Insurance Act, the FDIC as receiver succeeds to, and is empowered to sue and complain in any court of law to pursue, all claims held by banks for which it is the receiver. 12 U.S.C. §§ 1819, 1821(d)(2)(A)(i). Thus, the FDIC as Receiver for Colonial has authority to pursue claims held by Colonial, including the claims made against the defendants in this action.

5.   Defendant Countrywide Securities is a corporation organized under the laws of California.

6.   Defendant CWALT is a corporation organized under the laws of Delaware.

7.   Defendant CWMBS is a corporation organized under the laws of Delaware.

8.   Defendant CFC is a corporation organized under the laws of Delaware. It is the successor by merger to a corporation also named Countrywide Financial Corporation,

which will be referred to in this Complaint as **Old CFC**. Old CFC was the public holding company for the entire group of Countrywide companies, which will be referred to collectively in this Complaint as **Countrywide**. Old CFC existed until it was merged on July 1, 2008, into a subsidiary of Bank of America Corporation, which subsidiary was then renamed Countrywide Financial Corporation. By that merger, CFC succeeded to all liabilities of Old CFC, which was merged into CFC.

9. Plaintiff is informed and believes, and based thereon alleges, that Old CFC participated in the operations of Countrywide Securities, CWALT, and CWMBS, and had the power to control the conduct of Countrywide Securities, CWALT, and CWMBS in the transactions involved in this Complaint. Under Section 8-6-19(c) of the ASA and Section 15 of the 1933 Act, Old CFC directly or indirectly controlled Countrywide Securities, CWALT, and CWMBS, and would therefore have been liable (if it still existed) to Plaintiff jointly and severally with and to the same extent as Countrywide Securities, CWALT, and CWMBS. As a result of the merger of Old CFC into CFC, this liability passed to CFC.

10. Defendant BAC is a corporation organized under the laws of Delaware, and is the public holding company for a group of Bank of America companies. BAC and its subsidiaries will be referred to collectively in this Complaint as **Bank of America.**

7

11. Defendant Bear Stearns is a limited liability company organized under the laws of Delaware. Bear Stearns is the successor by merger to J. P. Morgan Securities Inc.

12. Defendant Citigroup is a corporation organized under the laws of New York.

13. Defendant Credit Suisse is a limited liability company organized under the laws of Delaware.

14. Defendant Morgan Stanley is a limited liability company organized under the laws of Delaware.

15. Defendant RBS is a corporation organized under the laws of Delaware.

16. Defendant UBS is a limited liability company organized under the laws of Delaware.

### III.   JURISDICTION AND VENUE

17. This Court has subject matter jurisdiction pursuant to Alabama Code § 8-6-19.

18. The amount in controversy exceeds the jurisdictional minimum of this Court.

19. This Court has personal jurisdiction over the defendants pursuant to Alabama Rule of Civil Procedure 4.2.

20. Venue is proper in this Court pursuant to Alabama Code § 6-3-7.

### IV.   SECURITIZATION OF MORTGAGE LOANS

21. The securities that Colonial purchased are so-called **residential mortgage-backed securities,** or **RMBS,** created in a process known as **securitization.** Securitization begins with loans on which the borrowers are

8

to make payments, usually monthly. The entity that makes the loans is known as the **originator** of the loans. The process by which the originator decides whether to make particular loans is known as the **underwriting** of loans. The purpose of underwriting is to ensure that loans are made only to borrowers of sufficient credit standing to repay them and only against sufficient collateral. In the loan underwriting process, the originator applies its **underwriting standards**.

22. In general, residential mortgage lenders may hold some of the mortgage loans they originate in their own portfolios and may sell other mortgage loans they originate into securitizations.

23. In a securitization, a large number of loans, usually of a similar type, are grouped into a **collateral pool**. The originator of those loans sells them (and, with them, the right to receive the cash flow from them) to a **trust**. The trust pays the originator cash for the loans. The trust raises the cash to pay for the loans by selling **securities**, usually called **certificates**, to investors such as Colonial. Each certificate entitles its holder to an agreed part of the cash flow from the loans in the collateral pool.

24. In a simple securitization, the holder of each certificate is entitled to a *pro rata* part of the overall monthly cash flow from the loans in the collateral pool.

9

25. In a more complex securitization, the cash flow is divided into different parts, usually called **tranches** ("tranche" is "slice" in French), and the certificates are divided into different **classes**, each with different rights. Each class of certificates is entitled to the cash flow in the tranche corresponding to that class.

26. One way in which the cash flow is divided — and the rights of different classes of certificates distinguished — is by priority of payment or, put differently, risk of nonpayment. The most **senior** class of certificates usually is entitled to be paid in full before the next most senior class, and so on. Conversely, losses from defaults in payment of the loans in the collateral pool are allocated first to the most **subordinate** class of certificates, then to the class above that, and so on. The interest rate on each class of certificates is usually proportional to the amount of risk that that class bears; the most senior certificates bear the least risk and thus pay the lowest rate of interest, the most subordinate, the opposite. This hierarchy of rights to payment is referred to as the **waterfall**.

27. The risk of a particular class of certificate is a function of both the riskiness of the loans in the collateral pool and the seniority of that class in the waterfall. Even if the underlying loans are quite risky, the certificates may bear so little of that risk that they may be rated as **triple-A**. (According to Moody's,

10

"[o]bligations rated Aaa are judged to be of the highest quality, with minimal credit risk.") For example, assume a securitization of $100 million of risky loans, on which the historical loss rate is 5%. Assume that there are two classes of certificates, a senior class of $50 million and a subordinate class of $50 million. Even though the underlying loans are quite risky, the senior class of certificates would be paid in full as long as the $100 million of loans produced payments of at least $50 million plus interest, that is, unless the loss rate on those loans exceeded 50%, fully ten times the historical average. All of the certificates referred to in this Complaint were rated triple-A when Colonial purchased them.

28. Each securitization has a **sponsor**, the prime mover of the securitization. Sometimes the sponsor is the originator or an affiliate. In originator-sponsored securitizations, the collateral pool usually contains loans made by the originator that is sponsoring the securitization. Other times, the sponsor may be an investment bank, which purchases loans from one or more originators, aggregates them into a collateral pool, sells them to a trust, and securitizes them. The sponsor arranges for title to the loans to be transferred to an entity known as the **depositor**, which then transfers title to the loans to the trust.

29. The obligor of the certificates in a securitization is the trust that purchases the loans in the

11

collateral pool. Because a trust has few assets other than the loans that it purchased, it may not be able to satisfy the liabilities of an issuer of securities (the certificates). The law therefore treats the depositor as the **issuer** of a residential mortgage-backed certificate.

30. **Securities underwriters**, like Bear Stearns, Citigroup, Countrywide Securities, Credit Suisse, JP Morgan, Morgan Stanley, RBS, and UBS, play a critical role in the process of securitization. They underwrite the sale of the certificates, that is, they purchase the certificates from the trust and then sell them to investors. Equally important, securities underwriters provide to potential investors the information that they need to decide whether to purchase certificates.

31. Because the cash flow from the loans in the collateral pool of a securitization is the source of funds to pay the holders of the certificates issued by the trust, the credit quality of those certificates is dependent upon the credit quality of the loans in the collateral pool (and upon the place of each certificate in the waterfall). The most important information about the credit quality of those loans is contained in the files that the originator develops while making the loans, the so-called "loan files." For residential mortgage loans, each loan file normally contains comprehensive information from such important documents as the borrower's application for the loan, credit reports on the borrower, and an appraisal of

12

the property that will secure the loan. The loan file may also include notes from the person who underwrote the loan about whether and how the loan complied with the originator's underwriting standards, including documentation of any "compensating factors" that justified any departure from those standards.

32. Potential investors in certificates are not given access to loan files. Instead, the securities underwriters are responsible for gathering, verifying, and presenting to potential investors the information about the credit quality of the loans that will be deposited into the trust. They do so by using information about the loans that has been compiled into a database known as a **loan tape**. The securities underwriters use the loan tape to compile numerous statistics about the loans, which are presented to potential investors in a **prospectus supplement**, a disclosure document that the underwriters are required to file with the Securities and Exchange Commission. (Colonial did not have access to the loan tapes before it purchased the certificates, but Plaintiff has reviewed data from the loan tapes in preparing this Complaint.)

33. As alleged in detail below, the information in the prospectus supplements and other offering documents about the credit quality of the loans in the collateral pools of the trusts contained many statements that were material to the credit quality of those loans, but were untrue or misleading.

13

## V.   DEFENDANTS' MATERIAL UNTRUE OR MISLEADING STATEMENTS ABOUT THE CERTIFICATES

34. Colonial purchased certificates in eight securitizations (referred to in this Complaint as Securitizations Nos. 1 through 8). Details of each securitization and each certificate are stated in Item 34 of Schedules 1 through 8 of this Complaint, which correspond to Securitizations Nos. 1 through 8. Plaintiff incorporates into this paragraph 34, and alleges as though fully set forth in this paragraph, the contents of Item 34 of the Schedules.

35. The prospectus supplement for each of the eight securitizations is available from the Securities and Exchange Commission's website. A URL for each prospectus supplement is included in Item 34 of the Schedules. The prospectus supplements are incorporated into this Complaint by reference.

36. In general, Plaintiff drew and analyzed a random sample of 400 loans from the collateral pools of each securitization in which Colonial purchased a certificate.[3]

---

[3] The group of loans that backed one of the certificates that Colonial purchased in Securitization No. 2 only had 393 loans. For that group, Plaintiff analyzed the 342 loans on which data were available. The group of loans that backed the other certificate that Colonial purchased in Securitization No. 2 only had 346 loans. For that group, Plaintiff analyzed the 282 loans on which data were available.

14

37. Many of the statements of material fact that the defendants made in the prospectus supplements were untrue or misleading. These untrue or misleading statements included the following.

**A.   Untrue or Misleading Statements About the Loan-to-Value Ratios (LTVs) of the Mortgage Loans, and the Appraisals of the Properties, in the Collateral Pools**

**1.   LTVs**

**(a)   The materiality of LTVs**

38. The loan-to-value ratio of a mortgage loan, or LTV, is the ratio of the amount of the mortgage loan to the lower of the appraised value or the sale price of the mortgaged property when the loan is made. For example, a loan of $300,000 secured by a property valued at $500,000 has an LTV of 60%; a loan of $450,000 on the same property has an LTV of 90%. LTV is one of the most crucial measures of the risk of a mortgage loan, and the LTVs of the mortgage loans in the collateral pool of a securitization are therefore one of the most crucial measures of the risk of certificates sold in that securitization. LTV is a primary determinant of the likelihood of default. The lower the LTV, the lower the likelihood of default. For example, the lower the LTV, the less likely it is that a decline in the value of the property will wipe out the owner's equity and thereby give the owner an incentive to stop making mortgage payments and abandon the property, a so-called strategic default. LTV also is a primary determinant of the

15

severity of losses on a loan that defaults. The lower the LTV, the lower the severity of losses if the loan defaults. Loans with lower LTVs provide greater "cushion," thereby increasing the likelihood that the proceeds of foreclosure will cover the unpaid balance of the mortgage loan.

39. Beyond these fundamental effects on the likelihood and severity of default, LTVs also affect prepayment patterns (that is, the number of borrowers who pay off their mortgage loans before maturity and when they do so) and therefore the expected lives of the loans. Prepayment patterns therefore affect many aspects of certificates that are material to the investors that purchase them, including the life of the certificate and the timing and amount of cash that the investor will receive during that life.

40. In addition, rating agencies use LTVs to determine the proper structuring and credit enhancement necessary for securities, such as the certificates that Colonial purchased, to receive a particular rating. If the LTVs of the mortgage loans in the collateral pool of a securitization are incorrect, the ratings of certificates sold in that securitization will also be incorrect.

41. An accurate denominator (that is, the value of the property) is essential to an accurate LTV. In particular, an inflated denominator will understate, sometimes greatly, the risk of a loan. To return to the example above, if the property whose actual value is $500,000 is valued incorrectly at $550,000, then the ostensible LTV of the

16

$300,000 loan falls from 60% to 54.5%, and the ostensible LTV of the $450,000 loan falls from 90% to 81.8%. In either case, the LTV based on the incorrect appraised value understates the risk of the loan.

42. For these reasons, a reasonable investor considers LTV critical to the decision whether to purchase a certificate in a securitization of mortgage loans. Even small differences in the weighted average LTVs of the mortgage loans in the collateral pool of a securitization have a significant effect on both the risk and the rating of each certificate sold in that securitization and, thus, are essential to the decision of a reasonable investor whether to purchase any such certificate.

### (b) Untrue or misleading statements about the LTVs of the mortgage loans in the collateral pools of these securitizations

43. In the prospectus supplements, the defendants made material untrue or misleading statements about the LTVs of the mortgage loans in the collateral pools of these securitizations. Each such statement is identified in Item 43 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 43, and alleges as though fully set forth in this paragraph, the contents of Item 43 of the Schedules.

44. The defendants made these statements as statements of fact. Plaintiff is informed and believes, and based thereon alleges, that the defendants intended that these statements be understood as statements of fact. Colonial

17

did understand the statements about the LTVs as statements of fact. Colonial had no access to appraisal reports or other documents or information from which it could verify the LTVs of the mortgage loans other than the statements that the defendants made about those LTVs.

> **(c) An automated valuation model demonstrates that the defendants' statements about the LTVs were untrue because they were based on overstated valuations of the properties in the collateral pools.**

45. The stated LTVs of many of the mortgage loans in the securitizations were significantly lower than the true LTVs because the denominators (that is, the value of the properties that secured those loans) that were used to determine the disclosed LTVs were overstated to a material extent. The weighted-average LTVs presented in the prospectus supplements were, therefore, untrue and misleading.

46. Using a comprehensive, industry-standard automated valuation model (**AVM**), it is possible to determine the true market value of a certain property as of a specified date. An AVM is based on objective criteria like the condition of the property and the actual sale prices of comparable properties in the same locale shortly before the specified date, and is more consistent, independent, and objective than other methods of appraisal. AVMs have been in widespread use for many years. The AVM on which these allegations are based incorporates a database of 500

18

million sales covering ZIP codes that represent more than 97% of the homes, occupied by more than 99% of the population, in the United States. Independent testing services have determined that this AVM is the most accurate of all such models.

47. For many of the properties that secured the mortgage loans, the model determined that the LTVs presented in the prospectus supplements were understated. In particular, for many of the properties, the model determined that the denominator (that is, the appraised value of the property as stated in the loan tape and compiled into the tables in the prospectus supplement) that was used in the disclosed LTV was 105% or more of the true market value as determined by the model as of date on which each individual mortgage loan closed. (The model considered no transactions that occurred after that date.) In contrast, the model determined that the denominator that was used in the disclosed LTV was 95% or less of the true market value on a much smaller number of properties. Thus, the number of properties on which the value was overstated exceeded by far the number on which the value was understated, and the aggregate amount overstated exceeded by far the aggregate amount understated.

19

48. For example, in Securitization No. 1, there were 4,833[4] mortgage loans that backed the certificate that Colonial purchased. On 1,547 of the properties that secured those loans, the model determined that the denominator that was used in the disclosed LTV was 105% or more of the true market value and the amount by which the stated values of those properties exceeded their true market values in the aggregate was $75,423,280. The model determined that the denominator that was used in the disclosed LTV was 95% or less of true market value on only 628 properties, and the amount by which the true market values of those properties exceeded the values reported in the denominators was $42,259,699. Thus, the number of properties on which the value was overstated exceeded by more than twice the number on which the value was understated, and the aggregate amount overstated was nearly twice the aggregate amount understated.

49. On one of the loans in Securitization No. 1, the amount of the loan was $319,000 and the stated value of the property was $399,000, resulting in a stated LTV of 80%. The model, however, determined that the true value of the property was $329,000, resulting in a true LTV of 97%. Thus, the stated value was higher than the true value by 21.3% and the stated LTV was lower than the true LTV by

_____
[4]    On the closing date of the securitization, there were 4,133 mortgage loans in the trust. After the closing date of the securitization, the trust purchased an additional 700 mortgage loans.

17%. Both of these were huge discrepancies that were material to the credit quality of the loan.

50. The overstated values of 1,547 properties made virtually every statement by the defendants about the LTVs of the mortgage loans untrue or misleading. For example, the defendants stated that all mortgage loans had an LTV of 100% or less. In fact, 181 of the mortgage loans had LTVs of over 100%. Defendants also stated that the weighted-average LTV of the loans in the collateral pool was 69.82%. In fact, the weighted-average LTV of the loans was 76.1%. These differences were material for the reasons stated above.

51. The results of the valuations by the automated model in this example are summarized in the following table.

| | |
|---|---|
| Number of loans that backed the certificate | 4,833 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 1,547 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $75,423,280 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 628 |
| Aggregate amount by which the true market values of those properties exceeded their stated values | $42,259,699 |
| Number of loans with LTVs over 100%, as stated by defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 181 |
| Weighted-average LTV, as stated by defendants | 69.82% |
| Weighted-average LTV, as determined by the model | 76.1% |

52. The model produced similar results for the mortgage loans in the collateral pools of each securitization. Details of the results of the model for each securitization are stated in Item 52 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 52, and alleges as though fully set forth in this paragraph, the contents of Item 52 of the Schedules.

> **(d)  These statements also were misleading because the defendants omitted to state that there were additional liens on a material number of the properties that secured the mortgage loans in the collateral pools.**

53. As mentioned above, the LTV of a mortgage loan is a key determinant of the likelihood that the mortgagor will default in payment of the mortgage. The lower the LTV, the

22

less likely that a decline in the value of the property will wipe out the owner's equity and thereby give the owner an incentive to stop making mortgage payments and abandon the property. Because LTV affects the behavior of borrowers so profoundly, accurate LTVs are essential to predicting defaults and prepayments by borrowers. Also, as mentioned above, LTV affects the severity of loss on those loans that do default. The power of LTV to predict defaults, prepayments, and severities is a major reason why reasonable investors consider the LTVs of mortgage loans important to the decision whether to purchase a certificate in the securitization of those loans.

54. The predictive power of the LTV of a mortgage loan is much reduced if there are additional liens on the same property. Additional liens reduce the owner's equity in the property and thereby increase the owner's incentive to stop making mortgage payments and abandon the property if the value of the property falls below the combined amount of all of the liens on the property (a strategic default). Additional liens also exacerbate delinquencies and defaults because they complicate the servicing of mortgage loans and the management of delinquencies and defaults. Servicers of the first-lien mortgage must then deal not only with the borrower, but also with the servicer of the second-lien mortgage. For example, the servicer of a single mortgage may want to grant a borrower forbearance while the borrower is unemployed and allow him or her to add missed payments

23

to the principal of the loan and to resume payments when he or she is employed again. But the servicer of the second-lien mortgage may refuse such forbearance and initiate foreclosure and thereby force the borrower into default on the first mortgage as well.

55. According to land records, many of the properties that secured mortgage loans in the collateral pools of the securitizations were subject to liens in addition to the lien of the mortgage in the pool at the time of the closing of these securitizations.[5] The defendants failed to disclose in the prospectus supplements any of these additional liens. These additional liens increased the risk that those owners would default in payment of the mortgage loans.

56. To take an example, of the 4,833 properties that secured the mortgage loans that backed the certificate that Colonial purchased in Securitization No. 1, at least 1,534 were subject to liens in addition to the lien represented by the mortgage in the collateral pool. The defendants did not disclose in the prospectus supplement that those liens existed. Defendants stated that the weighted-average LTV of the properties was 69.82%, when, solely because of the additional liens on these 1,534 properties, the weighted-

_____

[5]    In order to ensure that this calculation did not include liens that were paid off but were not promptly removed from land records, the additional liens referred to in this Complaint and the Schedules do not include liens that were originated on or before the date on which each mortgage loan in the pools was closed.

24

average combined LTV was 73.9%.[6] This is a significant difference.

57.  On one of the loans, the original balance of the mortgage loan was $243,600, the represented value of the property was $304,500, and the reported LTV was 80%. On the date of the closing of this securitization, however, there were undisclosed additional liens on this property of $60,900. Thus, when all liens on the property were taken into account, the combined LTV of the loan was 100%, which was 20% higher than the stated LTV on that loan. This was a huge discrepancy that was material to the credit quality of the loan. In many cases, the amount of the undisclosed additional liens was much greater than the owner's ostensible equity, putting the owner "under water" on the day on which this securitization closed.

58.  Details of the undisclosed additional liens in the securitizations are stated in Item 58 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 58, and alleges as though fully set forth in this paragraph, the contents of Item 58 of the Schedules. Plaintiff is informed and believes, and based thereon alleges, that discovery will demonstrate that the number of loans with additional liens is substantially higher than those disclosed in the Schedules.

---

[6]     The combined LTV is the ratio of all loans on a property to the value of the property.

25

59. Because the defendants did not disclose the existence or the amounts of these additional liens, all of the statements that they made about the LTVs of the mortgage loans were misleading.

## 2. **Appraisals**

60. As discussed above in paragraph 41, an accurate denominator (value of the mortgaged property) is essential to calculating an accurate LTV. An accurate appraisal of the property, in turn, is essential to identifying an accurate denominator.

61. In connection with these securitizations, there was undisclosed upward bias in appraisals of properties that secured mortgage loans and consequent understatement of the LTVs of those loans. This upward bias in appraisals caused the denominators that were used to calculate the LTVs of many mortgage loans to be overstated and, in turn, the LTVs to be understated. The defendants' statements regarding the LTVs of the mortgage loans in the collateral pools were misleading because they omitted to state that the appraisals of a material number of the properties that secured those loans were biased upwards. In addition, the defendants stated that the appraisals conformed to the Uniform Standards of Professional Appraisal Practice (**USPAP**), the professional standards that govern appraisers and appraisals (or to the standards of Fannie Mae and Freddie Mac, which required compliance with USPAP). Those

26

statements were false because upwardly biased appraisals do not conform to USPAP.

> **(a)** **The statements that the defendants made about the LTVs of the mortgage loans in the collateral pools were misleading because they omitted to state that the appraisals of a large number of the properties that secured those loans were biased upward, so that stated LTVs based on those appraisals were lower than the true LTVs of those mortgage loans.**

62. The defendants omitted to state that the appraisals in these securitizations used inaccurate property descriptions, ignored recent sales of the subject and comparable properties, and used sales of properties that were not comparable, all in order to inflate the values of the appraised properties. The appraisals used to compute the LTVs of many of the mortgage loans in the collateral pools were biased upwards. As alleged in paragraphs 46 through 52, in each trust, the number of properties for which the value was overstated exceeded by far the number for which the value was understated, and the aggregate amount overstated exceeded by far the aggregate amount understated. These ratios for each trust are summarized in the following table:

27

| Securitization No. | Ratio of Number of Properties Whose Value Was Overstated to Number Whose Value Was Understated | Ratio of Amount of Overvaluation to Amount of Undervaluation |
|---|---|---|
| 1 | 2.5 | 1.8 |
| 2 | 7.1 | 13.1 |
| 3 | 4.9 | 5.2 |
| 4 | 5.0 | 7.5 |
| 5 | 3.3 | 3.6 |
| 6 | 2.3 | 2.0 |
| 7 | 2.8 | 1.7 |
| 8 | 8.0 | 9.6 |

These lopsided results demonstrate the upward bias in appraisals of properties that secured the mortgage loans in the collateral pools.

63. Plaintiff is informed and believes, and based thereon alleges, that a material number of the upwardly biased appraisals were not statements of the appraisers' actual findings of the values of the properties based on their objective valuations.

**(b) The statements by the defendants about compliance with USPAP were untrue because the appraisals of a large number of the properties that secured the mortgage loans were biased upward.**

64. Appraisers and appraisals are governed by USPAP, which is promulgated by the Appraisal Standards Board. The Preamble to USPAP states that its purpose "is to promote and maintain a high level of public trust in appraisal practice." Both Fannie Mae and Freddie Mac require that appraisals comply with USPAP.

65. USPAP includes the following provisions:

(a) USPAP Standards Rule 2-1(b)(iii) requires that "Each written or oral real property appraisal report must clearly and accurately set forth the appraisal in a manner that will not be misleading."

(b) USPAP Standards Rule 1-4(a) provides that "When a sales comparison approach is necessary for credible assignment results, an appraiser must analyze such comparable sales data as are available to indicate a value conclusion."

(c) USPAP Standards Rule 1-4(b) provides that "When a cost approach is necessary for credible assignment results, an appraiser must:

> (i)   develop an opinion of site value by an appropriate appraisal method or technique;
>
> (ii)  analyze such comparable cost data as are available to estimate the cost new of the improvements (if any); and
>
> (iii) analyze such comparable data as are available to estimate the difference between the cost new and the present worth of the improvements (accrued depreciation)."

66. The Appraisal Standards Board, which promulgates USPAP, also issues Advisory Opinions. Although the Advisory Opinions do not establish new standards or interpret USPAP,

they "are issued to illustrate the applicability of appraisal standards in specific situations." Advisory Opinion 1 discussing "Sales History" states that "The requirement for the appraiser to analyze and report sales history and related information is fundamental to the appraisal process. Just as the appraiser must analyze pending and recent sales of comparable properties, the appraiser must take into account all pending and recent sales of the subject property itself."

67. In the prospectus supplements, the defendants made statements that the appraisals of properties that secured the mortgage loans in the collateral pools were made in compliance with USPAP or with the appraisal standards of Fannie Mae and Freddie Mac, which required compliance with USPAP. Details of each such statement are stated in Item 67 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 67, and alleges as though fully set forth in this paragraph, the contents of Item 67 of the Schedules.

68. Plaintiff is informed and believes, and based thereon alleges, that a material number of mortgage loans in the collateral pools had appraisals conducted that deviated from USPAP.

69. Each of the statements referred to in paragraph 67 was untrue because the appraisals of a material number of the properties referred to in each such statement did not conform to USPAP.

70. By each of the untrue and misleading statements referred to in paragraphs 43 and 67 above, the defendants materially understated the risk of the certificates that they issued, underwrote, or sold.

**B.   Untrue or Misleading Statements About the Occupancy Status of the Properties That Secured the Mortgage Loans in the Collateral Pools**

### 1.   The materiality of occupancy status

71. Residential real estate is usually divided into primary residences, second homes, and investment properties. Mortgages on primary residences are less likely to default than mortgages on non-owner-occupied residences and therefore are less risky. Occupancy status also influences prepayment patterns.

72. Occupancy status (that is, whether the property that secures a mortgage is to be the primary residence of the borrower, a second home, or an investment property) is an important measure of the risk of a mortgage loan. The percentage of loans in the collateral pool of a securitization that are not secured by mortgages on primary residences is an important measure of the risk of certificates sold in that securitization. Other things being equal, the higher the percentage of loans not secured by primary residences, the greater the risk of the certificates. A reasonable investor considers occupancy status important to the decision whether to purchase a certificate in a securitization of mortgage loans.

### 2. Untrue or misleading statements about the occupancy status of the properties that secured the mortgage loans in the collateral pools of these securitizations

73. In the prospectus supplements, the defendants made statements about the number of properties in the collateral pools of the securitizations that were the primary residences of their owners. To return to the example of Securitization No. 1, the defendants stated that, of the 4,133 initial mortgage loans that backed the certificate that Colonial purchased, at least 3,610 were secured by primary residences and 523 were not. Details of each such statement in the securitizations are stated in Item 73 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 73, and alleges as though fully set forth in this paragraph, the contents of Item 73 of the Schedules.

74. These statements were untrue or misleading because (i) the stated number of mortgage loans secured by primary residences was higher than the actual number of loans in that category or (ii) the stated number of mortgage loans not secured by primary residences was lower than the actual number of loans in that category.

### 3. Basis of the allegations above that these statements about the occupancy status of the properties that secured the mortgage loans in the collateral pools were untrue or misleading

75. Because they are less risky than other mortgage loans, mortgage loans on primary residences usually have

32

more favorable terms, including lower interest rates and more lenient underwriting standards, than mortgage loans on second homes and investment properties. Applicants for loans on second homes and investment properties therefore have an incentive to state that the property will be their primary residence even when it will not. Plaintiff is informed and believes, and based thereon alleges, that borrowers of many securitized loans did so.

76. A significant number of the properties in the collateral pools of the securitizations that were stated to be primary residences actually were not. Moreover, Plaintiff is informed and believes, and based thereon alleges, that there is additional evidence of occupancy fraud in the loan files of many more of the mortgage loans in the collateral pools.

77. With respect to some of the properties that were stated to be primary residences, the borrower instructed local tax authorities to send the bills for the taxes on the property to the borrower at an address other than the property itself. This is strong evidence that the mortgaged property was not the borrower's primary residence.

78. In some states and counties, the owner of a property is able to designate whether that property is his or her "homestead," which may reduce the taxes on that property or exempt the property from assets available to satisfy the owner's creditors, or both. An owner may designate only one property, which he or she must occupy,

33

as his or her homestead. The fact that an owner in one of these jurisdictions does not designate a property as his or her homestead when he or she can do so is strong evidence that the property was not his or her primary residence. With respect to some of the properties that were stated to be primary residences, the owner could have but did not designate the property as his or her homestead. That omission is strong evidence that the property was not the borrower's primary residence.

79. When a borrower actually occupies a newly mortgaged property, he or she normally notifies entities that send bills to him or her (such as credit card companies, utility companies, and local merchants) to send his or her bills to the address of the newly mortgaged property. Six months after the closing of the mortgage is ample time to complete this process. Six months after the closing of the mortgage, if the borrower is still receiving his or her bills at a different address, it is very likely that the borrower does not occupy the mortgaged property. For each securitization, a credit reporting agency specializing in mortgage loans compared the addresses in the borrowers' credit reports to the addresses of the mortgaged properties six months after the closing of the mortgage loans. Many borrowers whose mortgage loans were secured by properties that were stated in the loan tapes to be owner-occupied did not receive any bills at the address of the mortgaged property but did receive their bills at

34

another address or addresses. It is very likely that each of these borrowers did not occupy the mortgaged property.

80. In Securitization No. 1, 459 owners of properties that were stated to be primary residences instructed local tax authorities to send the bills for the taxes on those properties to them at different addresses; 665 owners of properties that were stated to be primary residences could have, but did not, designate those properties as their homesteads; and 471 owners of properties that were stated to be primary residences did not receive any of their bills there six months after the mortgages were originated. Eliminating duplicates, for one or more of these reasons, 1,244 of the 3,610 properties that were stated to be primary residences actually were not. Thus, the number of properties that were not primary residences was not 523, as defendants stated, but at least 1,767, a material difference. The numbers of such loans in the collateral pools of the securitizations are stated in Item 80 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 80, and alleges as though fully set forth in this paragraph, the contents of Item 80 of the Schedules.

81. By each of the untrue and misleading statements referred to in paragraph 73, the defendants materially understated the risk of the certificates that they issued, underwrote, or sold.

**C.    Untrue   or    Misleading   Statements   About   the
       Underwriting Standards of the Originator of the
       Mortgage Loans in the Collateral Pools**

   **1.   The materiality of underwriting standards and
          the extent of an originator's disregard of
          them**

82. Originators   of   mortgage   loans   have   written
standards by which they underwrite applications for loans.
An important purpose of underwriting is to ensure that the
originator makes mortgage loans only in compliance with
those standards and that its underwriting decisions are
properly documented. An even more fundamental purpose of
underwriting mortgage loans is to ensure that loans are
made only to borrowers with credit standing and financial
resources to repay the loans, and only against collateral
with value, condition, and marketability sufficient to
secure the loans. An originator's underwriting standards,
and the extent to which the originator does not follow its
standards, are important indicators of the risk of mortgage
loans made by that originator and of certificates sold in a
securitization   in   which   mortgage   loans   made   by   that
originator are part of the collateral pool. A reasonable
investor   considers   the   underwriting   standards   of
originators of mortgage loans in the collateral pool of a
securitization, and whether an originator disregards its
standards, important to the decision whether to purchase a
certificate in that securitization.

## 2. Untrue or misleading statements about the underwriting standards of the originator of the mortgage loans

83. In the prospectus supplements, the defendants made statements about the underwriting standards of the originator of the mortgage loans in the collateral pools. Details of each such statement are stated in Item 83 of the Schedules of this Complaint. They included statements that the originator made mortgage loans in compliance with its underwriting standards and made exceptions to those standards only when compensating factors were present. Plaintiff incorporates into this paragraph 83, and alleges as though fully set forth in this paragraph, the contents of Item 83 of the Schedules.

84. Plaintiff is informed and believes, and based thereon alleges, that these statements were untrue or misleading because the defendants omitted to state that: (a) the originator was disregarding those underwriting standards; (b) the originator was making extensive exceptions to those underwriting standards when no compensating factors were present; (c) the originator was making wholesale, rather than case-by-case, exceptions to those underwriting standards; (d) the originator was making mortgage loans that borrowers could not repay; and (e) the originator was failing frequently to follow quality-assurance practices necessary to detect and prevent fraud intended to circumvent its underwriting standards.

37

### 3. Basis of the allegations that these statements about the underwriting standards of the originator of the mortgage loans in the collateral pools were untrue or misleading

#### (a) The deterioration in undisclosed credit characteristics of mortgage loans made by the originator

85. Plaintiff is informed and believes, and based thereon alleges, that before and during the time of these securitizations, Countrywide Home Loans, Inc. (**CHL**), which originated or acquired all of the loans in the securitizations, disregarded its stated underwriting standards. As a result, securitized mortgage loans made between 2004 and the dates of these securitizations have experienced high rates of delinquency and default.

86. The high rates of delinquency and default were caused not so much by any deterioration in credit characteristics of the loans that were expressly embodied in underwriting standards and disclosed to investors, but rather by deterioration in credit characteristics that were not disclosed to investors.

87. Plaintiff is informed and believes that what was true about recently securitized mortgage loans in general was true in particular of loans originated by the entities that originated the loans in the collateral pools of these securitizations, as the following figures demonstrate. Taking the originator CHL, Figure 1 shows the rising incidence of early payment defaults (or **EPDs**), that is, the percent of loans (by outstanding principal balance) that

38

were originated and sold into securitizations by CHL and that became 60 or more days delinquent within six months after they were made. An EPD is strong evidence that the originator did not follow its underwriting standards in making the loan. Underwriting standards are intended to ensure that loans are made only to borrowers who can and will make their mortgage payments. Because an EPD occurs so soon after the mortgage loan was made, it is much more likely that the default occurred because the borrower could not afford the payments in the first place (and thus that the underwriting standards were not followed), than because of changed external circumstances unrelated to the underwriting of the mortgage loan (such as that the borrower lost his or her job). The bars in Figure 1 depict the incidence of EPDs in loans originated by CHL that were sold into securitizations. The steady increase in EPDs is further evidence that the deterioration in the credit quality of those loans was caused by disregard of underwriting standards.

39



Figure 1: Percent of Loans Originated by Countrywide Home Loans, Inc. or its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination

88. Figure 2 shows the weighted-average disclosed LTVs of the same loans and weighted-average disclosed credit scores of the borrowers. These were nearly constant, showing that the deterioration in the credit quality of the loans was caused not by these disclosed factors, but rather by undisclosed factors.

40



Figure 2: Percent of Loans Originated by Countrywide Home Loans, Inc. or its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination with Weighted-Average FICO and LTV

**(b) The poor performance of the loans in these pools demonstrates that the originator disregarded its underwriting guidelines when making these loans.**

89. As noted above, an EPD is evidence that the originator may have disregarded its underwriting standards in making the loan. The mortgage loans in some of the collateral pools of these securitizations experienced EPDs. These EPDs are evidence that the originator of those loans may have disregarded its underwriting standards when making those loans. The number and percent of the loans in each pool that suffered EPDs are stated in Item 89 of the Schedules of this Complaint. Plaintiff incorporates into

this paragraph 89, and alleges as though fully set forth in this paragraph, the contents of Item 89 of the Schedules.

90. A high rate of delinquency at any time in a group of mortgage loans is also evidence that the originator of those loans may have disregarded its underwriting standards in making the loans. A common measure of serious delinquency is the number of loans on which the borrowers were ever 90 or more days delinquent in their payments. The mortgage loans in the collateral pools have experienced very high rates of delinquencies by this measure. These high rates of delinquencies are strong evidence that the originator of those loans may have disregarded its underwriting standards when making those loans. The number and percent of the loans in each pool that suffered delinquencies of 90 days or more are stated in Item 90 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 90, and alleges as though fully set forth in this paragraph, the contents of Item 90 of the Schedules.

91. A second common measure of delinquency is the number of loans on which the borrowers are 30 or more days delinquent at a given point in time. The mortgage loans in the collateral pools have experienced very high rates of delinquencies by this measure. These high rates of delinquencies are strong evidence that the originator of those loans may have disregarded its underwriting standards when making those loans. The number and percent of the

42

loans in each pool that were 30 or more days delinquent on January 31, 2012, are stated in Item 91 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 91, and alleges as though fully set forth in this paragraph, the contents of Item 91 of the Schedules.

### (c) Other evidence shows that Countrywide Home Loans, Inc. disregarded its underwriting standards.

92. In addition to the statistical data cited above, other evidence shows that CHL (which originated or acquired all of the loans in the collateral pools of the eight securitizations), did not follow its stated underwriting standards.

93. Many loans that Countrywide originated were outside its already lax underwriting standards, because Countrywide frequently disregarded even those standards and made loans that borrowers could not afford to pay. *See* Complaint at 4, *S.E.C. v. Mozilo*, No. CV 09-3994-JFW (MANx) (C.D. Cal. 2009). In a memorandum dated December 13, 2007, the enterprise risk assessment officer at Countrywide stated that "borrower repayment capacity was not adequately assessed by the bank during the underwriting process for home equity mortgage loans." *Id.* at 23-24. In an email dated June 1, 2006, Countrywide's Chairman and CEO Angelo Mozilo wrote that borrowers "are going to experience a payment shock which is going to be difficult if not impossible for them to manage." *Id.* at 37.

43

94. Moreover, Countrywide "viewed borrowers as nothing more than the means for producing more loans, originating loans with little or no regard to borrowers' long-term ability to afford them." Complaint at 5, *California v. Countrywide Financial Corp.*, No. LC083076 (Cal. Super. 2008). Indeed, "to increase market share, [Countrywide] dispensed with many standard underwriting guidelines . . . to place unqualified borrowers in loans which ultimately they could not afford." Complaint at 5, *Washington v. Countrywide Financial Corp.*, No. 09-2-01690-6 (Wash. Super. 2009).

95. Plaintiff is informed and believes, and based thereon alleges, that Countrywide did not adhere to its own underwriting standards, but instead abandoned, ignored, or disregarded them. According to internal Countrywide documents, Mozilo admitted that loans "had been originated 'through our channels with disregard for process [and] compliance with guidelines.'" Complaint at 20-21, *S.E.C. v. Mozilo*, No. CV 09-3994-JFW (MANx) (C.D. Cal. 2009). Moreover, Countrywide did whatever it took to sell as many loans as it could, as quickly as possible, including by disregarding its underwriting standards. *See* Complaint at 5, *California v. Countrywide Financial Corp.*, No. LC083076 (Cal. Super. 2008).

96. Plaintiff is informed and believes, and based thereon alleges, that Countrywide made exceptions to its underwriting standards where no compensating factors

44

existed, resulting in higher rates of default, and used as "compensating factors" variables such as a borrower's credit score and LTV, which had already been used to determine that the loan did not fall within the guidelines. Complaint at 20-21, *S.E.C. v. Mozilo*, No. CV 09-3994-JFW (MANx) (C.D. Cal. 2009). Such "compensating factors" did not actually compensate for anything and did not "offset" any risk.

97. According to the Financial Crisis Inquiry Commission, Countrywide made loans that it knew borrowers could not afford to pay. In its final report, the FCIC noted that "Countrywide recognized that many of the loans they were originating could result in 'catastrophic consequences'" because the borrowers could not afford to pay. FINANCIAL CRISIS INQUIRY COMMISSION, THE FINANCIAL INQUIRY REPORT xxii (Public Affairs Reports, 2011).

98. Finally, Plaintiff is informed and believes, and based thereon alleges, that Countrywide did not apply its underwriting standards in accordance with all federal, state, and local laws. Countrywide has entered into agreements to settle charges of violation of predatory lending, unfair competition, false advertising, and banking laws with the attorneys general of at least 38 states, including Alaska, Arizona, California, Colorado, Connecticut, Delaware, Florida, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Michigan, Mississippi, Montana, Nebraska, Nevada,

45

New Jersey, New Mexico, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Dakota, Tennessee, Virginia, Washington, West Virginia, Wisconsin, and Wyoming. The attorneys general of these states alleged that Countrywide violated state predatory lending laws by (i) making loans it could not have reasonably expected borrowers to be able to repay; (ii) using high pressure sales and advertising tactics designed to steer borrowers towards high-risk loans; and (iii) failing to disclose to borrowers important information about the loans, including the costs and difficulties of refinancing, the availability of lower cost products, the existence and nature of prepayment penalties, and that advertised low interest rates were merely "teaser" rates that would adjust upwards dramatically as soon as one month after closing. Eighty-eight percent of the mortgages that were covered by the settlement with the attorneys general were sold into securitization trusts, like the eight in which Colonial purchased the certificates.

99. By each of the untrue and misleading statements referred to in paragraph 83 above, the defendants materially understated the risk of the certificates that they issued, underwrote, or sold. Moreover, Plaintiff is informed and believes, and based thereon alleges, that discovery will yield additional evidence that the originator disregarded its underwriting guidelines when

46

making the mortgage loans in the collateral pools of these securitizations.

**D.  The Large Number of Mortgage Loans in the Collateral Pools About Which the Defendants Made Material Untrue or Misleading Statements Made Their Statements About the Ratings of Colonial's Certificates Untrue and Misleading.**

100. In the prospectus supplements, the defendants made statements about the ratings of the certificates by ratings agencies. They stated that the ratings agencies rated each such certificate triple-A. Details of each such statement are stated in Item 100 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 100, and alleges as though fully set forth in this paragraph, the contents of Item 100 of the Schedules.

101. The ratings were important to the decision of any reasonable investor whether to purchase the certificates. Many investors, including Colonial, have investment policies that require a certain minimum rating for all investments. The policy of Colonial was to purchase only certificates that were rated at least double-A.

102. These statements by the defendants about the ratings of the certificates they issued, underwrote, or sold were misleading because the defendants omitted to state that the ratings were affected by all of the material untrue or misleading statements about specific mortgage loans in the collateral pools. These include:

47

(a) loans whose LTVs were materially understated as shown by the AVM;

(b) loans whose LTVs were misleading as a result of undisclosed additional liens;

(c) loans for which the properties were stated to be owner-occupied, but were not; and

(d) loans that suffered EPDs, strong evidence that the originator may have disregarded its underwriting standards in making those loans.

103. In Securitization No. 1, there were 1,547 loans whose LTVs were materially understated as shown by the AVM, 1,534 loans whose LTVs were misleading because of undisclosed additional liens, 1,244 loans for which the properties were stated to be owner-occupied but were not, and 6 loans that suffered EPDs. Eliminating duplicates, there were 3,274 loans (or 67.7% of the loans that backed the certificate that Colonial purchased) about which defendants made untrue or misleading statements. The numbers of such loans in the collateral pools of the securitizations are stated in Item 103 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 103, and alleges as though fully set forth in this paragraph, the contents of Item 103 of the Schedules.

104. Plaintiff is informed and believes, and based thereon alleges, that loan files and other documents available only through discovery will prove that those

statements were untrue or misleading with respect to many more loans as well.

105. By these untrue and misleading statements, the defendants materially understated the risk of the certificates that they issued, underwrote, or sold.

## VI.   LIABILITY OF CFC AS CONTROL PERSON

106. CWALT and CWMBS were special purpose entities formed for the sole purpose of purchasing mortgage loans, filing registration statements with the SEC, forming issuing trusts, assigning mortgage loans and all of their rights and interests in such mortgage loans to the trustee for the benefit of the certificateholders, and depositing the underlying mortgage loans into the issuing trusts.

107. CWALT was responsible for preparing and filing three of the shelf registration statements pursuant to which ten of the certificates were offered for sale. CWMBS was responsible for preparing and filing one shelf registration statement pursuant to which one of the certificates was offered for sale. CWALT and CWMBS were wholly-owned subsidiaries of Old CFC.

108. Countrywide Securities was a securities broker-dealer and underwriter. It was a wholly-owned subsidiary of Countrywide Capital Markets, Inc., which in turn was a wholly-owned subsidiary of Old CFC.

109. Old CFC was a publicly-traded holding company which, through its subsidiaries, engaged in mortgage lending, the securitization of mortgage loans, and other

49

finance-related businesses. Old CFC managed its mortgage lending and securities businesses in an integrated fashion. These activities included Old CFC's practice of originating, purchasing, and warehousing mortgage loans, using certain Countrywide subsidiaries; securitizing those same loans into mortgage-backed securities, using depositors CWALT and CWMBS, among other subsidiaries; and underwriting and selling mortgage-backed securities to third parties, using Countrywide Securities.

110. Countrywide Securities was part of Old CFC's Capital Markets Segment, which Old CFC used, among other things, to conduct conduit activities and to trade and underwrite securities. The operations, expenditures, and revenues of the Capital Markets Segment and Countrywide Securities were included in Old CFC's accounting statements and reflected in its filings with the SEC.

111. At all relevant times, the offices of CWALT, CWMBS, and Countrywide Securities were located in the same building as Old CFC's corporate headquarters in Calabasas, California. Officers of Old CFC met frequently with officers and directors of CWALT, CWMBS, and Countrywide Securities to direct and coordinate the subsidiaries' securitization business and activities.

112. Until September 2006, Stanford L. Kurland was the President and Chief Operating Officer of Old CFC. He also served as Chairman of the Board and as President and a director of CWALT and CWMBS. During the relevant time, N.

50

Joshua Adler was the President, Chief Executive Officer, and a director of CWALT and CWMBS. In these roles, Kurland and Adler were able to control and exert power over the general and day-to-day practices and policies of CWALT and CWMBS, including the issuance of the certificates that are the subject of the Complaint. Kurland signed the shelf registration statements pursuant to which CWALT issued the certificates in Securitizations Nos. 1, 2, 4, 5, 6, and 7. Kurland also signed the shelf registration statement pursuant to which CWMBS issued the certificate in Securitization No. 8. Adler signed the shelf registration statement pursuant to which CWALT issued the certificate in Securitization No. 3.

113. Ranjit M. Kripalani served as Executive Vice President of Old CFC as well as President and Executive Managing Director of Old CFC's Capital Markets Segment. At the same time, Kripalani served as President of Countrywide Capital Markets Inc. and as President and Chief Executive Officer of Countrywide Securities, further ensuring Old CFC's control and power over the general and day-to-day practices and policies of Countrywide Securities.

114. Plaintiff is informed and believes, and based thereon alleges, that additional officers and directors of Old CFC served as officers or directors of CWALT, CWMBS, and Countrywide Securities, and worked closely with those subsidiaries in order to establish and maintain Old CFC's control and power over the general and day-to-day practices

and policies of the subsidiaries and Countrywide's conduit business, including the issuance and sale of the certificates that are the subject of the Complaint.

115. In sum, as a result of its structure and the organization of its business, as well as its ownership and placement of key personnel, Old CFC had the power to control the general affairs and day-to-day practices and policies of CWALT, CWMBS, and Countrywide Securities, including the power directly or indirectly to control or influence those entities' policies related to the issuance, underwriting, and sale of the certificates that are the subject of the Complaint.

116. As a result, Old CFC, as control person, was liable to Plaintiff jointly and severally with and to the same extent as CWALT, CWMBS, and Countrywide Securities. This liability passed to CFC when Old CFC merged into CFC.

## VII. LIABILITY OF DEFENDANT BANK OF AMERICA CORPORATION AND ITS SUBSIDIARIES AS SUCCESSORS TO CFC, COUNTRYWIDE SECURITIES, CWALT, AND CWMBS

117. Bank of America Corporation (**BAC**) and its subsidiaries (BAC and its subsidiaries are referred to together in this Complaint as **Bank of America**) have taken the assets of CFC and other Countrywide entities into the operating companies of Bank of America while leaving their liabilities in moribund companies that have few or no operations or assets. The full extent of BAC's and Bank of America's conduct is not known because of the sparse public disclosures that BAC has made about those transactions.

Based on the facts alleged below, BAC and its subsidiaries are liable for the claims asserted in this Complaint as successors to CFC, Countrywide Securities, CWALT, and CWMBS, because (a) the consideration that Bank of America paid to Countrywide for the latter's assets was inadequate, (b) there was continuity of ownership between Bank of America and Countrywide, (c) Countrywide ceased ordinary business soon after Bank of America purchased its assets, (d) there was continuity of management, personnel, physical location, assets, and general business operations between Bank of America and Countrywide, and (e) Bank of America assumed the liabilities necessary for the uninterrupted continuation of Countrywide's business. In addition, Bank of America assumed Countrywide's mortgage repurchase and tort liabilities.

118. At all relevant times, BAC was a public company whose stock was traded on the New York Stock Exchange.

119. On January 11, 2008, BAC and Old CFC entered into an Agreement and Plan of Merger (referred to in this Complaint as the **Merger Agreement**) pursuant to which Old CFC would be merged into Red Oak Merger Corporation, a wholly-owned subsidiary of BAC formed to accomplish the merger. Old CFC would then cease to exist, and Red Oak would continue as the surviving company.

120. Under the Merger Agreement, the shareholders of Old CFC would receive, and ultimately did receive, 0.1822 shares of BAC stock for each share of Old CFC, thereby

53

maintaining those shareholders' ownership interest in the businesses of Old CFC.

121. After the merger, Red Oak was to be renamed Countrywide Financial LLC but was in fact renamed Countrywide Financial Corporation (which is CFC), the same name as the publicly-traded Countrywide entity (Old CFC) that ceased to exist upon the completion of the merger.

122. In a Form 8-K filing also dated January 11, 2008, BAC disclosed that the Merger Agreement was between Old CFC and BAC, the public company, not any subsidiary or affiliate of BAC.

123. In a press release accompanying the Form 8-K, BAC stated that Bank of America intended initially to operate Countrywide separately under the Countrywide brand and that integration of Countrywide's operations with the operations of Bank of America would occur in 2009.

124. On February 22, 2008, an article appeared in the periodical *Corporate Counsel* about the litigation that Countrywide then faced and its possible implications for Bank of America. In the article, a spokesperson for Bank of America acknowledged that Bank of America had "bought the company [Old CFC] and all of its assets and liabilities[,] . . . was aware of the claims and potential claims against the company and [had] factored these into the purchase."

125. On May 28, 2008, BAC filed a Form 8-K and issued a press release stating that Bank of America was creating a new banking management structure and that a long-time Bank

54

of America officer, Barbara Desoer, would become president of the new consumer real estate operations of "Countrywide Financial Corporation and Bank of America when they are combined." The press release also stated that Desoer would be based in Countrywide's principal offices in Calabasas, California.

126. BAC and Old CFC consummated the merger on July 1, 2008. As a result, Old CFC ceased to exist. By operation of law, as a consequence of the merger, Red Oak (soon thereafter renamed Countrywide Financial Corporation, which is defendant CFC) assumed the liabilities of Old CFC.

127. In a July 1, 2008, Form 8-K and press release, Desoer, the president of Bank of America's consumer real estate unit, stated that it was time to "begin to combine the two companies and prepare to introduce our new name and way of operating." The release also confirmed that the combined entity would be based in Calabasas, California, the former principal offices of Countrywide. Plaintiff is informed and believes, and based thereon alleges, that Bank of America's consumer real estate unit has been and remains housed in the offices formerly occupied by Countrywide. For example, Desoer moved into the office formerly used by Angelo Mozilo, the former CEO of Old CFC. Moreover, Bank of America retained a substantial number of former employees of Countrywide to operate its consumer real estate unit. Indeed, in October 2008, Desoer stated that the combined

company had named a mix of Bank of America and Countrywide executives to leadership roles.

128. On October 29, 2008, Countrywide Securities withdrew its registration as a broker dealer from the Financial Industry Regulatory Authority. Without this registration, Countrywide Securities was unable to continue in the business in which it had primarily been engaged (securities dealing and underwriting). Therefore, as of October 29, 2008, Countrywide Securities effectively ceased doing business, too.

129. In its annual report for the fiscal year ended December 31, 2008, BAC disclosed that the fair value of the non-cash assets obtained and liabilities assumed through the merger with Countrywide were $157.4 billion and $157.8 billion, respectively.

130. Contemporaneously with the merger, BAC announced that certain Countrywide entities would sell specified assets to specific Bank of America entities. According to BAC, the consideration paid for these assets was approximately $32 billion in cash or cash equivalents. According to BAC's disclosures, approximately $125 billion in non-cash assets would be left in CFC and not conveyed pursuant to these asset sales, which were completed on or about July 3, 2008.

131. On October 6, 2008, BAC filed a Form 8-K announcing, among other things, that CFC and another former subsidiary of Old CFC, Countrywide Home Loans, Inc. (**CHL**),

would transfer all or substantially all of their assets to unnamed subsidiaries of BAC in exchange for the assumption of approximately $21 billion of Countrywide debt. In contrast to the relatively detailed disclosures that BAC made about the merger and the first round of asset sales, BAC and Bank of America offered virtually no details about these contemplated asset sales. Plaintiff is informed and believes, and based thereon alleges, that the intended effect of these transactions was to further integrate into the operations of Bank of America the Countrywide assets, while leaving the liabilities with CFC and CHL.

132. On November 7, 2008, BAC filed a Form 8-K announcing, among other things, that in connection with the integration of Countrywide's operations into Bank of America's other business operations, CFC and CHL had transferred substantially all of their assets to BAC. Again, Bank of America disclosed almost no details of these transactions. Plaintiff is informed and believes, and based thereon alleges, that, primarily as a result of these transfers of assets, CFC and CHL are now moribund organizations, with few, if any, assets or operations. This conclusion is confirmed by Bruce Bingham, a business valuation expert who attempted to value CFC in a report sent to The Bank of New York Mellon, which is the trustee of numerous trusts containing Countrywide-issued mortgage-backed securities. Mr. Bingham concluded that CFC had negative earnings, minimal operating revenues, and no

57

viable operations. The operational status of Countrywide Securities (as well as all other Countrywide entities) is comparable to that of CFC and CHL.

133. Plaintiff is informed and believes, and based thereon alleges, that transferees of Countrywide's assets may have included other subsidiaries of BAC rather than, or in addition to, BAC. Because of the sparse disclosures about these transactions, it is impossible to be certain which Bank of America entities were involved.

134. As the principal consideration for the asset sales on November 7, 2008, BAC assumed debt securities and related guarantees of Countrywide in an aggregate amount of $16.6 billion. BAC assumed much of this debt through the amendment of indenture agreements substituting BAC as the issuer and/or guarantor of the securities subject to the indentures.

135. According to Bank of America's own figures, Bank of America obtained approximately $125 billion in assets in exchange for the assumption of $16.6 billion in debt. Therefore, Plaintiff is informed and believes, and based thereon alleges, that the consideration given for Countrywide's assets was not commensurate with the value of the assets that Bank of America obtained. Presumably, Bank of America will contest these figures. Yet, Bank of America itself has acknowledged the difficulty in proving the actual value transferred and received. In *MBIA Insurance Corp. v. Countrywide Home Loans, Inc.*, Index No. 602825/08,

58

pending in the Supreme Court of the State of New York for the County of New York, at a hearing held on June 27, 2012, counsel for Bank of America informed the court that to resolve the "difficult" and "complicated" valuation issue, extensive expert testimony would be required.

136. On April 27, 2009, Bank of America issued a press release announcing the rebranding of CHL operations as Bank of America Home Loans. Bank of America stated that the new brand would represent the combined operations of Bank of America's mortgage and home equity business and CHL. Bank of America further explained that it was in the process of rebranding Countrywide's "locations, account statements, marketing materials and advertising" and that the "full systems conversion" would be completed later that year.

137. As of September 21, 2009, liability for the deposits in Countrywide Bank, N.A. was assumed by Bank of America, N.A. On November 9, 2009, online account services for Countrywide mortgages were consolidated with Bank of America's Online Banking website. *See, e.g.*, Mortgage Loan Officer Locator, http://www.home.countrywide.com (last visited August 9, 2012).

138. Old CFC's website now redirects visitors to the Bank of America website. *See* http://www.countrywide.com, *redirected to* www8.bankofamerica.com/home-loans/overview.go (last visited August 9, 2012).

139. By the complex and sparsely-disclosed transactions described above, Bank of America has combined Countrywide's

operations with its own business operations and proceeded to operate them.

140. Bank of America operates its combined consumer real estate unit out of the common headquarters of Old CFC, CHL, Countrywide Securities, CWMBS, and CWALT. Plaintiff is informed and believes, and based thereon alleges, that Bank of America employs many former employees of Countrywide to operate this combined unit.

141. Plaintiff is informed and believes, and based thereon alleges, that Bank of America's rebranded consumer real estate business, Bank of America Home Loans, now operates out of more than 1,000 former Countrywide offices nationwide.

142. Public statements by Old CFC and Bank of America reflect that the companies intended that their business operations be combined and understood and anticipated that Bank of America would be responsible for the liabilities of Old CFC and Countrywide. In its press release announcing the merger, BAC declared that it planned to operate Countrywide separately under the Countrywide brand for a limited period only, with integration to occur in 2009. In its 2008 annual report, BAC stated that as a "combined company," Bank of America would be recognized as a responsible lender. Similarly, representatives of Old CFC stated that the "combination" with Bank of America would create one of the most powerful mortgage franchises in the world.

143. On at least two occasions, two different Chief Executive Officers of BAC publicly acknowledged that BAC intended to assume the liabilities of Countrywide when it acquired Countrywide's assets. One CEO acknowledged in January 2008 that BAC "looked at every aspect of the deal, from their [Countrywide's] assets to potential lawsuits." On an earnings conference call on November 16, 2010, another CEO stated that BAC "would pay for the things that Countrywide did."

144. Bank of America has, in fact, made a practice of taking responsibility for Countrywide liabilities. For example, on October 6, 2008, Bank of America settled lawsuits brought against Countrywide companies by state attorneys general by agreeing to modify loans for 390,000 borrowers, valued at more than $8 billion.

145. Similarly, on January 3, 2011, Bank of America paid $2.8 billion to Fannie Mae and Freddie Mac to settle claims for billions of dollars in hundreds of thousands of loans that went sour after Fannie Mae and Freddie Mac bought them from Countrywide. In exchange for the payments, Fannie Mae and Freddie Mac agreed to drop their demands that Bank of America buy back Countrywide mortgages.

146. On May 26, 2011, Bank of America agreed to pay approximately $22 million to settle charges that it improperly had foreclosed on the homes of active-duty members of the United States military. In a press release announcing the settlement, Bank of America noted that most

61

of the mortgage loans at issue had been made by Countrywide before Bank of America's merger with Countrywide and that most of the improper foreclosure activity also had been Countrywide's. Nevertheless, Bank of America said that it was responsible to "make things right."

147. In a proposed settlement of Countrywide liabilities announced on June 29, 2011, Bank of America agreed to pay $8.5 billion for the benefit of investors in Countrywide trusts to resolve, among other things, claims against Countrywide for breach of representations and warranties made about the mortgage loans in the trusts and for violating prudent standards of care in servicing those loans. The release of Bank of America contemplated by this settlement expressly includes claims against Bank of America for successor liability.

148. Because BAC continues to operate the businesses of Countrywide, it had to assume the liabilities necessary to continue those operations, and Plaintiff is informed and believes, and based thereon alleges, that it did so.

149. In addition to paying for Countrywide's liabilities, Bank of America also has asserted claims as the successor to Countrywide. For example, in a proceeding in the United States Bankruptcy Court for the District of Nebraska, *In re Peter J. Kerby*, Case No. 97-81961, BAC's attorney-in-fact filed a motion on behalf of "Bank of America Corporation successor to Countrywide Home Loans." In the limited power of attorney by which BAC appointed

that attorney-in-fact (which was also submitted to the Bankruptcy Court), a Vice President and Senior Recovery Manager of BAC executed the power of attorney on behalf of "Bank of America Corporation successor to Countrywide Home Loans." Attached to the power of attorney were several pages, including the signature page, of the Merger Agreement. BAC later filed an amended motion and again submitted the power of attorney to the Bankruptcy Court. This time, attached to the power of attorney was a "Bank of America Corporation Hierarchy [R]eport," which listed 21 subsidiaries of CFC. There is a handwritten star next to the entry for "Countrywide Home Loans, Inc."

150. Similarly, on September 9, 2010, an amended proof of claim for approximately $21.5 million was filed in *In re Alliance Bancorp, Inc.*, Case No. 07-10943, pending in the United States Bankruptcy Court for the District of Delaware. In this amended proof of claim, the creditor is identified as "Countrywide Home Loans, Inc. (through its successor, Bank of America, NA)." And in the Attachment to the Amended Proof of Claim, which was also filed with the bankruptcy court, the creditor is identified as "Countrywide Home Loans, Inc. ('Countrywide'), through its successor by merger, Bank of America." Finally, footnote 1 of the Attachment states that "[r]eference to 'Countrywide' includes reference to affiliates thereof and who together have claims against Alliance Inc., through Countrywide's successor by merger, Bank of America."

63

151.  Thus,  Bank  of  America  is  trying  to  accomplish exactly  what  the  doctrine  of  successor  liability  is  meant to  prevent  –  claiming  to  be  a  successor  to  Countrywide  when asserting  claims  while  simultaneously  denying  that  it  is  a successor  to  Countrywide  when  resisting  claims  against  it.

## VIII.  STATUTES OF LIMITATIONS

152. All  of  the  claims  in  this  Complaint  are  timely. Plaintiff  became  receiver  for  Colonial  on  August  14,  2009. Under  12  U.S.C.  §  1821(d)(14),  the  statutes  of  limitations on  all  of  Colonial's  claims  asserted  in  this  Complaint  that had  not  expired  as  of  August  14,  2009,  are  extended  to  no less  than  three  years  from  that  date.  This  Complaint  was filed  less  than  three  years  from  August  14,  2009.

153. The  statutes  of  limitations  applicable  to  the claims  asserted  in  this  Complaint  had  not  expired  as  of August  14,  2009,  because  a  reasonably  diligent  plaintiff would  not  have  discovered  until  later  than  August  14,  2008, facts  that  show  that  the  particular  statements  referred  to in  Items  34,  43,  67,  73,  83,  and  100  of  the  Schedules  to this  Complaint  were  untrue  or  misleading.  Those  are statements  about  the  20,788  specific  mortgage  loans  in  the collateral  pools  of  the  securitizations  involved  in  this action,  not  about  residential  mortgage  loans  or  any  type  of residential  mortgage  loan  (e.g.,  prime,  Alt-A,  subprime, etc.)  in  general.  A  reasonably  diligent  plaintiff  did  not have  access  until  after  August  14,  2008,  to  facts  about those  specific  loans  that  show  that  the  statements  that

64

defendants made about those specific loans were untrue or misleading. A reasonably diligent plaintiff did not have access to the loan files compiled by the originator of those specific mortgage loans nor to records maintained by the servicers of those specific mortgage loans (from either or both of which a reasonably diligent plaintiff may have discovered facts that show that the statements that defendants made about those specific loans were untrue or misleading) because originators and servicers of loans and securitization trustees do not make those files available to certificateholders. Moreover, on and prior to August 14, 2008, there were not available to a reasonably diligent plaintiff, even at considerable expense, data about those specific loans that show that the statements that defendants made about those specific loans were untrue or misleading. Such data became available for the first time in early 2010.

154. When Colonial purchased the certificates involved in this action, all of them were rated triple-A, the highest possible rating, by at least two of Fitch, Moody's, and Standard & Poor's, all Nationally Recognized Statistical Rating Organizations (**NRSROs**) accredited by the Securities and Exchange Commission. Sponsors of securitizations submitted to the NRSROs the same information about the loans in the collateral pools of proposed securitizations that they included in the prospectus supplements for those securitizations, including

in particular statements of the type referred to in Items 34, 43, 67, 73, 83, and 100 of the Schedules to this Complaint. The NRSROs used and relied on that information in rating the certificates to be issued in each securitization.

155. The NRSROs monitored the certificates that they rated after those certificates were issued. If an NRSRO discovers facts that show that there was an untrue or misleading statement about a material fact in the information submitted to it for its use in rating a certificate, then the NRSRO will withdraw its rating of that certificate while it considers the impact of the untrue or misleading statement, or it will downgrade the rating of the certificate, usually to a rating below investment grade.

156. As noted above, all of the certificates involved in this action were rated triple-A at issuance by at least two of Fitch, Moody's, and Standard & Poor's. Not one of those NRSROs withdrew any of those ratings, or downgraded any of them to below investment grade, before August 14, 2008. The date on which each certificate was first downgraded below investment grade is stated in Item 34 of the Schedules.

157. If a reasonably diligent plaintiff would have discovered before August 14, 2008, facts that show that the particular statements referred to in Items 34, 43, 67, 73, 83, and 100 of the Schedules to this Complaint were untrue

66

or misleading, then the NRSROs, which were monitoring the certificates and are much more sophisticated than a reasonably diligent plaintiff, would also have discovered such facts and withdrawn or downgraded their ratings on the certificates to below investment grade. The fact that none of the NRSROs did so demonstrates that, before August 14, 2008, a reasonably diligent plaintiff could not have discovered facts that show that those statements were untrue or misleading.

158. Even if a reasonably diligent plaintiff would have discovered before August 14, 2008, facts that show that the particular statements referred to in Items 34, 43, 67, 73, 83, and 100 of the Schedules to this Complaint were untrue or misleading, the claims in this action would still be timely. As a purchaser of the certificates, Colonial was, and Plaintiff as Receiver for Colonial is, a member of the proposed class in *Luther v. Countrywide Financial Corporation*, Superior Court of the State of California, County of Los Angeles, No. BC 380698, filed on November 14, 2007. The pendency of *Luther* has tolled the running of the statutes of limitations on the claims in this Complaint.

159. Six of the securitizations from which Colonial purchased certificates, Securitizations Nos. 1, 2, 4, 5, 6, and 7, were included in the original Class Action Complaint filed in *Luther* on November 14, 2007. None of those securitizations has been dismissed from *Luther*.

67

160. Two of the securitizations from which Colonial purchased certificates, Securitizations Nos. 3 and 8, were included in the original Class Action Complaint filed in *Washington State Plumbing & Pipefitting Pension Trust v. Countrywide Financial Corporation*, Superior Court of the State of California, County of Los Angeles, No. BC 392571, filed on June 12, 2008. That action was consolidated with *Luther*, and those securitizations are included in the Consolidated Class Action Complaint filed on October 16, 2008. Neither of those securitizations has been dismissed from *Luther*.

## IX.   CAUSES OF ACTION

### A.   Untrue or Misleading Statements in the Sale of Securities Under Section 8-6-19(a)(2) of the ASA

161. Plaintiff hereby incorporates by reference, as though fully set forth, paragraphs 1 through 160.

162. Morgan Stanley underwrote and sold to Colonial the certificate in Securitization No. 1. Morgan Stanley sent communications and solicitations to Colonial in Montgomery, Alabama, for the purpose of inducing Colonial to purchase a certificate in Securitization No. 1. The sale of this certificate occurred in Alabama because employees or agents of Morgan Stanley directed communications about the certificate and solicitations to purchase the certificate to Colonial there, and because Colonial received those communications and solicitations there.

163. In doing the acts alleged in the sale to Colonial of the certificate in Securitization No. 1, Morgan Stanley violated Section 8-6-19(a)(2) of the ASA by offering or selling a security in this State by means of written communications that included untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

164. RBS underwrote and sold to Colonial two certificates in Securitization No. 2. RBS sent communications and solicitations to Colonial in Montgomery, Alabama, for the purpose of inducing Colonial to purchase certificates in Securitization No. 2. The sale of these certificates occurred in Alabama because employees or agents of RBS directed communications about the certificates and solicitations to purchase the certificates to Colonial there, and because Colonial received those communications and solicitations there.

165. In doing the acts alleged in the sale to Colonial of the certificates in Securitization No. 2, RBS violated Section 8-6-19(a)(2) of the ASA by offering or selling securities in this State by means of written communications that included untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

69

166. Credit Suisse underwrote and sold to Colonial the certificate in Securitization No. 3. Credit Suisse sent communications and solicitations to Colonial in Montgomery, Alabama, for the purpose of inducing Colonial to purchase a certificate in Securitization No. 3. The sale of this certificate occurred in Alabama because employees or agents of Credit Suisse directed communications about the certificate and solicitations to purchase the certificate to Colonial there, and because Colonial received those communications and solicitations there.

167. In doing the acts alleged in the sale to Colonial of the certificate in Securitization No. 3, Credit Suisse violated Section 8-6-19(a)(2) of the ASA by offering or selling a security in this State by means of written communications that included untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

168. UBS underwrote and sold to Colonial one of the certificates in Securitization No. 4. UBS sent communications and solicitations to Colonial in Montgomery, Alabama, for the purpose of inducing Colonial to purchase a certificate in Securitization No. 4. The sale of this certificate occurred in Alabama because employees or agents of UBS directed communications about the certificate and solicitations to purchase the certificate to Colonial

there, and because Colonial received those communications and solicitations there.

169. In doing the acts alleged in the sale to Colonial of the certificate in Securitization No. 4, UBS violated Section 8-6-19(a)(2) of the ASA by offering or selling a security in this State by means of written communications that included untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

170. Citigroup underwrote and sold to Colonial two certificates in Securitization No. 5. Citigroup sent communications and solicitations to Colonial in Montgomery, Alabama, for the purpose of inducing Colonial to purchase certificates in Securitization No. 5. The sale of these certificates occurred in Alabama because employees or agents of Citigroup directed communications about the certificates and solicitations to purchase the certificates to Colonial there, and because Colonial received those communications and solicitations there.

171. In doing the acts alleged in the sale to Colonial of the certificates in Securitization No. 5, Citigroup violated Section 8-6-19(a)(2) of the ASA by offering or selling securities in this State by means of written communications that included untrue statements of material fact or omitted to state material facts necessary in order

71

to make the statements made, in the light of the circumstances under which they were made, not misleading.

172. CWALT was the depositor of Securitizations Nos. 1 through 5, and therefore is the issuer of seven certificates that Colonial purchased when they were initially offered to the public. The sale of the certificates occurred in Alabama because employees or agents of Citigroup, Credit Suisse, Morgan Stanley, RBS, and UBS directed communications about the certificates and solicitations to purchase the certificates to Colonial there, and because Colonial received those communications and solicitations there.

173. CWALT prepared and signed the registration statements for the certificates for the purpose of soliciting investors, including Colonial, to purchase certificates when they were initially offered to the public, motivated at least in part by its own financial interest or that of the direct seller.

174. The sales were in the initial offering of the certificates and each certificate was sold by means of a prospectus supplement. Therefore, under 17 C.F.R. § 230.159A(a), CWALT is considered to have offered or sold the certificates to Colonial.

175. In doing the acts alleged in the offer or sale to Colonial of seven certificates in Securitizations Nos. 1 through 5, CWALT violated Section 8-6-19(a)(2) of the ASA by offering or selling securities in this State by means of

72

written communications that included untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

176. Plaintiff has disposed of all of the certificates.

177. Under Section 8-6-19 of the ASA, Plaintiff is entitled to recover the consideration paid for each of these certificates, plus interest at the legal rate from the date of purchase to the date of disposition, minus the amount of income received on the certificate, minus the greater of the value of the security when Plaintiff disposed of it or the consideration that Plaintiff received for the security.

## B. Liability as a Controlling Person Under Section 8-6-19(c) of the ASA

178. Plaintiff hereby incorporates by reference, as though fully set forth, paragraphs 1 through 177.

179. Old CFC, by or through stock ownership, agency, or otherwise, controlled CWALT within the meaning of Section 8-6-19(c) of the ASA.

180. In doing the acts alleged, CWALT violated Section 8-6-19(a)(2) of the ASA by offering or selling seven certificates in Securitizations Nos. 1 through 5.

181. As a result of the merger of Old CFC and Bank of America, Old CFC's control person liability passed to CFC.

182. CFC is therefore jointly and severally liable with and to the same extent as CWALT.

73

### C. Untrue or Misleading Statements in the Sale of Securities Under Section 12(a)(2) of the 1933 Act

183. Plaintiff hereby incorporates by reference, as though fully set forth, paragraphs 1 through 182.

184. Colonial purchased the certificate in Securitization No. 1 that Morgan Stanley sold to Colonial when it was initially offered to the public.

185. Morgan Stanley solicited Colonial to purchase the certificate, and sold the certificate to Colonial, by means of the prospectus supplement and other written offering materials and oral communications.

186. The prospectus supplement and other written offering materials and oral communications that Morgan Stanley sent to Colonial contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements, in the light of the circumstances in which they were made, not misleading.

187. Colonial did not know when it purchased the certificate in Securitization No. 1 that the statements in the prospectus supplement and other written offering materials and oral communications that Morgan Stanley sent to Colonial were untrue or misleading.

188. In doing the acts alleged in the sale to Colonial of the certificate in Securitization No. 1, Morgan Stanley violated Section 12(a)(2) of the 1933 Act.

74

189. Colonial purchased two certificates in Securitization No. 2 that RBS sold to Colonial when they were initially offered to the public.

190. RBS solicited Colonial to purchase the certificates, and sold these certificates to Colonial, by means of the prospectus supplement and other written offering materials and oral communications.

191. The prospectus supplement and other written offering materials and oral communications that RBS sent to Colonial contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements, in the light of the circumstances in which they were made, not misleading.

192. Colonial did not know when it purchased the certificates in Securitization No. 2 that the statements in the prospectus supplement and other written offering materials and oral communications that RBS sent to Colonial were untrue or misleading.

193. In doing the acts alleged in the sale to Colonial of the certificates in Securitization No. 2, RBS violated Section 12(a)(2) of the 1933 Act.

194. Colonial purchased the certificate in Securitization No. 3 that Credit Suisse sold to Colonial when it was initially offered to the public.

195. Credit Suisse solicited Colonial to purchase the certificate, and sold the certificate to Colonial, by means

of the prospectus supplement and other written offering materials and oral communications.

196. The prospectus supplement and other written offering materials and oral communications that Credit Suisse sent to Colonial contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements, in the light of the circumstances in which they were made, not misleading.

197. Colonial did not know when it purchased the certificate in Securitization No. 3 that the statements in the prospectus supplement and other written offering materials and oral communications that Credit Suisse sent to Colonial were untrue or misleading.

198. In doing the acts alleged in the sale to Colonial of the certificate in Securitization No. 3, Credit Suisse violated Section 12(a)(2) of the 1933 Act.

199. Colonial purchased the certificate in Securitization No. 4 that UBS sold to Colonial when it was initially offered to the public.

200. UBS solicited Colonial to purchase the certificate, and sold the certificate to Colonial, by means of the prospectus supplement and other written offering materials and oral communications.

201. The prospectus supplement and other written offering materials and oral communications that UBS sent to Colonial contained untrue statements of material fact and omitted to state material facts necessary in order to make

76

the statements, in the light of the circumstances in which they were made, not misleading.

202. Colonial did not know when it purchased the certificate in Securitization No. 4 that the statements in the prospectus supplement and other written offering materials and oral communications that UBS sent to Colonial were untrue or misleading.

203. In doing the acts alleged in the sale to Colonial of the certificate in Securitization No. 4, UBS violated Section 12(a)(2) of the 1933 Act.

204. Colonial purchased the certificates in Securitization No. 5 that Citigroup sold to Colonial when they were initially offered to the public.

205. Citigroup solicited Colonial to purchase these certificates, and sold the certificates to Colonial, by means of the prospectus supplement and other written offering materials and oral communications.

206. The prospectus supplement and other written offering materials and oral communications that Citigroup sent to Colonial contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements, in the light of the circumstances in which they were made, not misleading.

207. Colonial did not know when it purchased the certificates in Securitization No. 5 that the statements in the prospectus supplement and other written offering

materials and oral communications that Citigroup sent to Colonial were untrue or misleading.

208. In doing the acts alleged in the sale to Colonial of the certificates in Securitization No. 5, Citigroup violated Section 12(a)(2) of the 1933 Act.

209. CWALT was the depositor of Securitizations Nos. 1 through 5 and therefore is the issuer of seven certificates that Colonial purchased when they were initially offered to the public.

210. CWALT prepared and signed the registration statements for the certificates for the purpose of soliciting investors, including Colonial, to purchase certificates when they were initially offered to the public, motivated at least in part by its own financial interest or that of the direct seller.

211. These sales were in the initial offering of the certificates and each certificate was sold by means of a prospectus supplement. Therefore, under 17 C.F.R. § 230.159A(a), CWALT is considered to have offered or sold the certificates to Colonial.

212. In doing the acts alleged in the offer or sale to Colonial of seven certificates in Securitizations Nos. 1 through 5, CWALT violated section 12(a)(2) of the 1933 Act.

213. Plaintiff expressly excludes from this cause of action any allegation that could be construed as alleging fraud or intentional or reckless conduct. This cause of

action is based solely on allegations of strict liability or negligence under the 1933 Act.

214. When it failed on August 14, 2009, Colonial had not discovered that the defendants made untrue or misleading statements about the certificates. Plaintiff discovered that the defendants made untrue or misleading statements in the sale of each security in the course of its investigation in 2012.

215. Plaintiff has suffered a loss on each of these certificates.

216. Plaintiff is entitled to recover damages.

D.    **Untrue or Misleading Statements in a Registration Statement Under Section 11 of the 1933 Act**

217. Plaintiff hereby incorporates by reference, as though fully set forth, paragraphs 1 through 216.

218. CWALT is the depositor of Securitizations Nos. 1 through 7, and therefore is the issuer of ten certificates that Colonial purchased. In doing the acts alleged, CWALT violated Section 11 of the 1933 Act in connection with issuing the certificates in Securitizations Nos. 1 through 7.

219. CWMBS is the depositor of Securitization No. 8, and therefore is the issuer of one certificate that Colonial purchased. In doing the acts alleged, CWMBS violated Section 11 of the 1933 Act in connection with issuing the certificate in Securitization No. 8.

220. Countrywide Securities underwrote Securitizations Nos. 1, 2, and 3. In doing the acts alleged, Countrywide Securities violated Section 11 of the 1933 Act in connection with underwriting the certificates in Securitizations Nos. 1, 2, and 3.

221. Morgan Stanley underwrote Securitizations Nos. 1, 4, 5, and 8. In doing the acts alleged, Morgan Stanley violated Section 11 of the 1933 Act in connection with underwriting the certificates in Securitizations Nos. 1, 4, 5, and 8.

222. RBS underwrote Securitization No. 2. In doing the acts alleged, RBS violated Section 11 of the 1933 Act in connection with underwriting the certificates in Securitization No. 2.

223. Credit Suisse underwrote Securitizations Nos. 3 and 8. In doing the acts alleged, Credit Suisse violated Section 11 of the 1933 Act in connection with underwriting the certificates in Securitizations Nos. 3 and 8.

224. UBS underwrote Securitizations Nos. 4 and 7. In doing the acts alleged, UBS violated Section 11 of the 1933 Act in connection with underwriting the certificates in Securitizations Nos. 4 and 7.

225. Citigroup underwrote Securitization No. 5. In doing the acts alleged, Citigroup violated Section 11 of the 1933 Act in connection with underwriting the certificates in Securitization No. 5.

226. Bear Stearns underwrote Securitization No. 6. In doing the acts alleged, Bear Stearns violated Section 11 of the 1933 Act in connection with underwriting the certificate in Securitization No. 6.

227. JP Morgan underwrote Securitizations Nos. 6 and 7. In doing the acts alleged, JP Morgan violated Section 11 of the 1933 Act in connection with underwriting the certificates in Securitizations Nos. 6 and 7.

228. The certificates in these securitizations were issued pursuant or traceable to registration statements. Details of each registration statement and each certificate are stated in Item 34 of the Schedules.

229. The registration statements, as amended by the prospectus supplements, contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading. These untrue and misleading statements included all of the untrue and misleading statements described in paragraphs 38 through 105.

230. Colonial purchased each certificate before the issuer made generally available an earning statement covering a period of at least twelve months.

231. Plaintiff expressly excludes from this cause of action any allegation that could be construed as alleging fraud or intentional or reckless conduct. This cause of

action is based solely on allegations of strict liability or negligence under the 1933 Act.

232. Colonial did not know when it purchased the certificates that the statements in the registration statements, as amended by the prospectus supplements, were untrue or misleading.

233. When it failed on August 14, 2009, Colonial had not discovered that the defendants made untrue or misleading statements about the certificates. Plaintiff discovered that the defendants made untrue or misleading statements about each security in the course of its investigation in 2012.

234. Colonial has suffered a loss on each of these certificates.

235. Plaintiff is entitled to recover damages as described in 15 U.S.C. § 77k(e).

## E. Liability as a Controlling Person Under Section 15 of the 1933 Act

236. Plaintiff hereby incorporates by reference, as though fully set forth, paragraphs 1 through 235.

237. Old CFC, by or through stock ownership, agency, and as otherwise described above, controlled CWALT, CWMBS, and Countrywide Securities within the meaning of Section 15 of the 1933 Act.

238. In doing the acts alleged, CWALT violated Sections 11 and 12(a)(2) of the 1933 Act by issuing, offering, or selling certain of the certificates.

239. In doing the acts alleged, CWMBS violated Section 11 of the 1933 Act by issuing a certificate.

240. In doing the acts alleged, Countrywide Securities violated Section 11 of the 1933 Act by underwriting certain of the certificates.

241. As a result of the merger of Old CFC and Bank of America, Old CFC's control person liability passed to CFC.

242. CFC is therefore jointly and severally liable with and to the same extent as CWALT, CWMBS, and Countrywide Securities.

## F. Liability as Successor to Countrywide Securities, CWALT, and CFC

243. This cause of action is alleged against defendant BAC.

244. Plaintiff hereby incorporates by reference, as though fully set forth, paragraphs 1 through 242 of this Complaint.

245. For the reasons described above, BAC is jointly and severally liable for any and all injury and damages resulting from the conduct of Countrywide Securities, CWALT, CWMBS, or CFC, because BAC is the successor-in-interest to Countrywide Securities, CWALT, CWMBS, and CFC.

246. BAC became the successor-in-interest to Countrywide Securities, CWALT, CWMBS, and CFC because (a) through the transactions that took place between July 1, 2008, and November 7, 2008, it gave inadequate consideration to Countrywide; (b) there was continuity of

83

ownership between Bank of America and Countrywide; (c) Countrywide ceased ordinary business soon after the merger transaction was consummated; (d) there was continuity of management, personnel, physical location, assets, and general business operations between Bank of America and Countrywide; and (e) Bank of America assumed the liabilities ordinarily necessary for the uninterrupted continuation of Countrywide's business. BAC is also a successor-in-interest to Countrywide because Bank of America assumed Countrywide's mortgage repurchase and tort liabilities.

247. BAC is therefore jointly and severally liable with and to the same extent as Countrywide Securities, CWALT, CWMBS, and CFC.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against defendants for damages in an amount to be determined at trial, but not less than $153.7 million, plus attorneys' fees, costs of court, and pre- and post-judgment interest at the appropriate allowable rates. Plaintiff further requests that the Court order any and all other relief at law and in equity to which Plaintiff is entitled.

## JURY DEMAND

**Plaintiff demands a trial by jury of all issues triable by jury.**

Dated: August 10, 2012
      Montgomery, Alabama

*Dennis R. Bailey*

Digitally signed by DRB
DN: cn=DRB, o=Rushton Stakely,
ou=Litigation,
email=drb@rushtonstakely.com, c=US
Date: 2012.08.10 13:16:17 -05'00'

Dennis R. Bailey (BAI028)
R. Austin Huffaker (HUF006)
J. Evans Bailey (BAI062)

Of Counsel:

RUSHTON, STAKELY, JOHNSTON & GARRETT, P.A.
184 Commerce Street
Post Office Box 270
Montgomery, Alabama 36101-0270
(334) 206-3234 (phone)
(334) 481-0031 (fax)
drb@rushtonstakely.com (Dennis Bailey E-mail)
rah2@rushtonstakely.com (Austin Huffaker E-mail)
ebailey@rushtonstakely.com (Evans Bailey E-mail)

Of Counsel:

David J. Grais (*pro hac vice* to be submitted)
Mark B. Holton (*pro hac vice* to be submitted)
GRAIS & ELLSWORTH LLP
1211 Avenue of the Americas
New York, New York 10036
(212)755-0100 (phone)
(212)755-0052 (fax)

           Attorneys for Plaintiff Federal
           Deposit Insurance Corporation as
           Receiver for Colonial Bank

**Defendants may be served via certified mail at:**

| | |
|---|---|
| Countrywide Securities Corporation | CT Corporation System<br>818 West Seventh Street<br>Los Angeles, California 90017 |
| CWALT, Inc. | The Corporation Trust Company<br>Corporation Trust Center<br>1209 Orange Street<br>Wilmington, Delaware 19801 |
| CWMBS, Inc. | The Corporation Trust Company<br>Corporation Trust Center<br>1209 Orange Street<br>Wilmington, Delaware 19801 |
| Countrywide Financial Corporation | The Corporation Trust Company<br>Corporation Trust Center<br>1209 Orange Street<br>Wilmington, Delaware 19801 |
| Bank of America Corporation | The Corporation Trust Company<br>Corporation Trust Center<br>1209 Orange Street<br>Wilmington, Delaware 19801 |
| Citigroup Global Markets Inc. | CT Corporation System<br>2 North Jackson Street, Suite 605<br>Montgomery, Alabama 36104 |
| Credit Suisse Securities (USA) LLC | CSC Lawyers Incorporating Service Inc.<br>150 S. Perry Street<br>Montgomery, Alabama 36104 |
| J.P. Morgan Securities LLC | CT Corporation System<br>2 North Jackson Street, Suite 605<br>Montgomery, Alabama 36104 |
| Morgan Stanley & Co. LLC | CT Corporation System<br>2 North Jackson Street, Suite 605<br>Montgomery, Alabama 36104 |
| RBS Securities Inc. | Corporation Service Company<br>2711 Centerville Road, Suite 400<br>Wilmington, Delaware 19808 |

UBS Securities LLC

CSC Lawyers Incorporating
Service Inc.
150 S. Perry Street
Montgomery, Alabama 36104

## SCHEDULE 1 OF THE COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the Complaint, those allegations are made against defendants CWALT, Morgan Stanley, Countrywide Securities, CFC, and BAC.

**Item 34. Details of trust and certificate(s).**

**(a) Dealer that sold the certificate(s) to Colonial**: Morgan Stanley.

**(b) Description of the trust**: Alternative Loan Trust, Mortgage Pass-Through Certificates, Series 2005-86CB was a securitization in December 2005 of 4,133 mortgage loans, in one group.[1] CWALT was the issuer of the securities in the trust. The mortgage loans in the collateral pool of this securitization were originated or acquired by Countrywide Home Loans, Inc. CWALT 2005-86CB Pros. Sup. S-4, S-14, and S-26.

**(c) Description of the certificate(s) that Colonial purchased**: Morgan Stanley and Countrywide Securities were the underwriters of the security that

---

[1]   CWALT 2005-86CB was a securitization with a supplemental loan account that enabled it to purchase additional mortgage loans. CWALT 2005-86CB Pros. Sup. S-4; S-25. On the closing date of the securitization there were 4,133 mortgage loans in the trust (the "Initial Mortgage Loans"). After the closing date of the securitization, the trust purchased an additional 700 mortgage loans. The data contained in the charts and tables in this schedule include the additional 700 mortgage loans, unless otherwise indicated.

Colonial purchased. Morgan Stanley offered and sold to Colonial a senior certificate in this securitization, in class A-1, for which Colonial paid $18,137,254 plus accrued interest, on January 13, 2006.

**(d) Ratings of the certificate(s) when Colonial purchased them**: Moody's: Aaa; S&P: AAA.

**(e) Current ratings of the certificate(s)**: Moody's: Caa3; S&P: D.

**(f) Date on which the certificate(s) were downgraded below investment grade**: February 20, 2009.

**(g) URL of prospectus supplement for this securitization**: http://www.sec.gov/Archives/edgar/data/1269518/00009501 2905012355/v15567e424b5.txt

**(h) Registration statement pursuant or traceable to which the certificate(s) were issued**: Certificates in this trust, including the certificate that Colonial purchased, were issued pursuant or traceable to a registration statement filed by CWALT with the SEC on form S-3 on June 17, 2005. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

**Item 43.  Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, CWALT, Morgan Stanley, and Countrywide Securities made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a) "No Initial Mortgage Loan had a Loan-to-Value Ratio at origination of more than 98.00%." CWALT 2005-86CB Pros. Sup. S-15.

(b) In the section of the prospectus supplement entitled "The Mortgage Pool," CWALT, Morgan Stanley, and Countrywide Securities presented tables of statistics about the mortgage loans in the collateral pool. Each table focused on a certain characteristic of the loans (for example, current principal balance) and divided the loans into categories based on that characteristic (for example, loans with current principal balance of $0.01 to $50,000.00, $50,000.01 to $100,000.00, $100,000.01 to $150,000.00, etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted Average Original Loan-to-Value Ratio." There were 10 such tables in "The Mortgage Pool" section for all of the loans in the collateral pool. In each table, the number of categories into which the loans were divided ranged from 3 to 29. Thus, in "The Mortgage Pool" section, CWALT, Morgan Stanley, and Countrywide Securities made many untrue or misleading statements

**SCHEDULE 1 OF THE COMPLAINT**                     **Page 3**

about the original LTVs of the loans in the collateral pool. CWALT 2005-86CB Pros. Sup. S-17 to S-23.

(c)  "As of the initial cut-off date, the weighted-average original Loan-to-Value Ratio of the Initial Mortgage Loans is approximately 69.82%." CWALT 2005-86CB Pros. Sup. S-20.

**Item 52. Details of the results of the AVM analysis for the loans that backed the certificate:**

| | |
|---|---:|
| Number of loans that backed the certificate | 4,833 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 1,547 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $75,423,280 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 628 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $42,259,699 |
| Number of loans with LTVs over 100%, as stated by defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 181 |
| Weighted-average LTV, as stated by defendants | 69.82% |
| Weighted-average LTV, as determined by the model | 76.1% |

**Item 58. Undisclosed additional liens:**

(a)  **Minimum number of properties with additional liens:** 1,534

(b)  **Weighted average CLTV with additional liens:** 73.9%

**Item 67. Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, CWALT, Morgan Stanley, and Countrywide Securities made the following statement about the appraisals of the properties that secured the mortgage loans originated by Countrywide Home Loans, Inc.: "All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect." CWALT 2005-86CB Pros. Sup. S-28.

**Item 73. Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, CWALT, Morgan Stanley, and Countrywide Securities made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a) In "The Mortgage Pool" section of the prospectus supplement, described in Item 43, CWALT, Morgan Stanley, and Countrywide Securities presented a table entitled "Occupancy Types." This table divided all of the loans in the collateral pool into the categories "Primary Residence," "Investment Property," and "Secondary Residence." The table contained untrue and misleading statements about, among other data, the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate

principal balance outstanding in each of these categories. CWALT 2005-86CB Pros. Sup. S-22.

(b) In the "Occupancy Types" table, CWALT, Morgan Stanley, and Countrywide Securities stated that of the 4,133 Initial Mortgage Loans in the collateral pool, 3,610 were secured by primary residences, and 523 were not. CWALT 2005-86CB Pros. Sup. S-22.

**Item 80. Details of properties that were stated to be owner-occupied, but were not:**

    **(a) Number of loans for which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 459**

    **(b) Number of loans for which the owner of the property could have, but did not, designate the property as his or her homestead: 665**

    **(c) Number of loans for which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address: 471**

    **(d) Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true: 1,244**

**Item 83. Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-26 through S-31 of the prospectus supplement, CWALT, Morgan Stanley, and Countrywide Securities made statements about the underwriting guidelines of Countrywide Home Loans, Inc. All of those statements are incorporated herein by reference.

One of those statements was that: "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." CWALT 2005-86CB Pros. Sup. S-27.

Another one of those statements was that: "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower." CWALT 2005-86CB Pros. Sup. S-27.

**Item 89. Early payment defaults:**

    (a) **Number of the mortgage loans that suffered EPDs:** 6

    (b) **Percent of the mortgage loans that suffered EPDs:** 0.1%

**Item 90. 90+ days delinquencies:**

    (a) **Number of the mortgage loans that suffered 90+ days delinquencies:** 1,169

    (b) **Percent of the mortgage loans that suffered 90+ days delinquencies:** 24.2%

**Item 91. 30+ days delinquencies:**

    (a) **Number of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 987

    (b) **Percent of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 20.4%

**Item 100. Statements about the ratings of the certificate(s) that Colonial purchased:**

On page S-3 of the prospectus supplement, CWALT, Morgan Stanley, and Countrywide Securities made statements about the ratings assigned to the certificates issued in this securitization. CWALT, Morgan Stanley, and Countrywide Securities stated that Colonial's certificate was rated Aaa by Moody's Investors Service, Inc. and AAA by Standard & Poor's Rating Services. CWALT 2005-86CB Pros. Sup. S-3. These were the highest ratings available from these two rating agencies.

CWALT, Morgan Stanley, and Countrywide Securities also stated: "The classes of certificates listed below will not be offered unless they are assigned the following ratings by Standard and Poor's Ratings Services . . . and by Moody's Investors Service, Inc. . . ."

CWALT, Morgan Stanley, and Countrywide Securities also stated: "It is a condition to the issuance of the senior certificates that they be rated 'AAA' by Standard & Poor's. . . . It is a condition to the issuance of the senior certificates (other than the Class A-3 Certificates) that they be rated 'Aaa' by Moody's Investors Service, Inc. . . ." CWALT 2005-86CB Pros. Sup. S-70.

Item 103. Summary of loans about which the defendants made untrue or misleading statements:

    (a)   Number of loans whose LTVs were materially understated as shown by the AVM: 1,547

    (b)   Number of loans whose LTVs were misleading because of undisclosed additional liens: 1,534

    (c)   Number of loans for which the properties were stated to be owner-occupied but were not: 1,244

    (d)   Number of loans that suffered EPDs: 6

    (e)   Eliminating duplicates, number of loans about which the defendants made untrue or misleading statements: 3,274

    (f)   Eliminating duplicates, percent of loans about which the defendants made untrue or misleading statements: 67.7%

## SCHEDULE 2 OF THE COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the Complaint, those allegations are made against defendants CWALT, RBS, Countrywide Securities, CFC, and BAC.

**Item 34. Details of trust and certificate(s).**

**(a) Dealer that sold the certificate(s) to Colonial**: RBS.

**(b) Description of the trust:** Alternative Loan Trust, Mortgage Pass-Through Certificates, Series 2006-30T1 was a securitization in September 2006 of 676 mortgage loans, in two groups.[2] CWALT was the issuer of the securities in the trust. The mortgage loans in the collateral pool of this securitization were originated or acquired by Countrywide Home Loans, Inc. CWALT 2006-30T1 Pros. Sup. S-4, S-54.

**(c) Description of the certificate(s) that Colonial purchased:** RBS and Countrywide Securities were the underwriters of the securities that Colonial purchased. RBS offered and sold to Colonial a senior

---

[2] CWALT 2006-30T1 was a prefunded securitization. CWALT 2006-30T1 Pros. Sup. S-5. On the closing date of the securitization there were 676 mortgage loans in the trust (the "Initial Mortgage Loans"). CWALT 2006-30T1 Pros. Sup. S-30, S-35, S-42. After the closing date of the securitization, the trust purchased an additional 63 mortgage loans. The data contained in the charts and tables in this schedule include those additional 63 mortgage loans that were added to loan groups 1 and 2, unless otherwise indicated.

certificate in this securitization, in class 1-A-5, for which Colonial paid $37,617,083 plus accrued interest on October 11, 2006. RBS also offered and sold to Colonial a senior certificate in this securitization, in class 2-A-6, for which Colonial paid $29,271,609 plus accrued interest on December 26, 2006. Colonial's certificates were paid by all of the loans in the collateral pool.

**(d) Ratings of the certificate(s) when Colonial purchased them**: Class 1-A-5: Fitch: AAA; Moody's: Aaa. Class 2-A-6: Fitch: AAA; Moody's: Aaa; S&P: AAA.

**(e) Current ratings of the certificate(s)**: Class 1-A-5: Fitch: C; Moody's: Caa3. Class 2-A-6: Fitch: C; Moody's: Ca; S&P: CCC.

**(f) Date on which the certificate(s) were downgraded below investment grade**: Class 1-A-5: December 17, 2008. Class 2-A-6: December 17, 2008.

**(g) URL of prospectus supplement for this securitization**:
http://sec.gov/Archives/edgar/data/1269518/000095012406005681/v23754b5e424b5.txt

**(h) Registration statement pursuant or traceable to which the certificate(s) were issued**: Certificates in this trust, including the certificates that Colonial purchased, were issued pursuant or traceable to a registration statement filed by CWALT with the SEC on form S-3 on February 7, 2006. Annexed to the

**SCHEDULE 2 OF THE COMPLAINT** Page 2

registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

## Item 43. Untrue or misleading statements about the LTVs of the mortgage loans:

In the prospectus supplement, CWALT, RBS, and Countrywide Securities made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a) As of the initial cut-off date, the weighted average original LTV ratio of the Initial Mortgage Loans in loan group 1 was 73.28%. CWALT 2006-30T1 Pros. Sup. S-6.

(b) As of the initial cut-off date, the weighted average original LTV ratio of the Initial Mortgage Loans in loan group 2 was 73.73%. CWALT 2006-30T1 Pros. Sup. S-6.

(c) "No Initial Mortgage Loan in any loan group had a Loan-to-Value Ratio at origination or on the closing date of more than 100%." CWALT 2006-30T1 Pros. Sup. S-32.

(d) In the section of the prospectus supplement entitled "The Mortgage Pool," CWALT, RBS, and Countrywide Securities presented tables of statistics about the mortgage loans in the collateral pool. Each table focused on a certain characteristic of the loans

(for example, current principal balance) and divided the loans into categories based on that characteristic (for example, loans with current principal balances of $400,000.01 to $450,000.00, $450,000.01 to $500,000.00, $500,000.01 to $550,000.00, $550,000.01 to $600,000.00 etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted Average Original Loan-to-Value Ratio." There were 13 such tables in the "Mortgage Pool" section for the Initial Mortgage Loans in each of loan groups 1 and 2. In each table the number of categories into which the Initial Mortgage Loans were divided ranged from 2 to 18. Thus, in the "Mortgage Pool" section, CWALT, RBS and Countrywide Securities made many untrue or misleading statements about the original LTVs of the Initial Mortgage Loans in loan groups 1 and 2. CWALT 2006-30T1 Pros. Sup. S-35 to S-50.

(e) "As of the initial cut-off date, the weighted average original Loan-to-Value Ratio of the Initial Mortgage Loans in loan group 1 was approximately 73.28%." CWALT 2006-30T1 Pros. Sup. S-6, S-37.

(f) "As of the initial cut-off date, the weighted average original Loan-to-Value Ratio of the Initial Mortgage Loans in loan group 2 was approximately 73.73%". CWALT 2006-30T1 Pros. Sup. S-6, S-45.

(g) "As of the cut-off date, the weighted average original Combined Loan-to-Value Ratio of the mortgage

**SCHEDULE 2 OF THE COMPLAINT** **Page 4**

loans in loan group 1 was approximately 78.81%." CWALT
2006-30T1 Pros. Sup. S-38.

   (h)  "As of the cut-off date, the weighted average
original Combined Loan-to-Value Ratio of the mortgage
loans in loan group 2 was approximately 81.36%." CWALT
2006-30T1 Pros. Sup. S-46.

**Item 52.  Details of the results of the AVM analysis for
         the loans that backed the certificates:**

| | |
|---|---:|
| Number of loans that backed the certificates (loan group 1 and loan group 2) | 739 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 302 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $59,464,577 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 43 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $4,534,047 |
| Number of loans with LTVs over 100%, as stated by defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 86 |
| Weighted-average LTV, as stated by defendants (group 1) | 73.28% |
| Weighted-average LTV, as stated by defendants (group 2) | 73.73% |
| Weighted-average LTV, as determined by the model (all collateral) | 89.9% |

**Item 67. Untrue or misleading statements about compliance with USPAP:**

(a) In the prospectus supplement, CWALT, RBS, and Countrywide Securities made the following statement about the appraisals of the properties that secured the mortgage loans originated or acquired by Countrywide Home Loans, Inc.: "All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect." CWALT 2006-30T1 Pros. Sup. S-57.

**Item 73. Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, CWALT, RBS, and Countrywide Securities made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a) In "The Mortgage Pool" section of the prospectus supplement, described in Item 43, CWALT, RBS, and Countrywide Securities presented a table entitled "Occupancy Types." This table divided all of the mortgage loans in each loan group into the categories "Primary Residence," "Investment Property," and "Secondary Residence." This table contained untrue or misleading statements about, among other data, the number of Initial Mortgage Loans, the aggregate principal balance outstanding, and the percent of

Initial Mortgage Loans in loan group 1 and loan group 2 in each of these categories. CWALT 2006-30T1 Pros. Sup. S-40, S-48.

(b) In the "Occupancy Types" table for the loans in group 1, CWALT, RBS, and Countrywide Securities stated that of the 366 Initial Mortgage Loans in loan group 1, 327 were secured by primary residences, and 39 were not. CWALT 2006-30T1 Pros. Sup. S-40.

(c) In the "Occupancy Types" table for the loans in group 2, CWALT, RBS, and Countrywide Securities stated that of the 310 Initial Mortgage Loans in loan group 2, 272 were secured by primary residences, and 38 were not. CWALT 2006-30T1 Pros. Sup. S-48.

**Item 80. Details of properties that were stated to be owner-occupied, but were not:**

    **(a) Number of loans for which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address:** 66

    **(b) Number of loans for which the owner of the property could have, but did not, designate the property as his or her homestead:** 124

    **(c) Number of loans for which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address:** 58

    **(d) Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true:** 192

**Item 83. Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-54 through S-60 of the prospectus supplement, CWALT, RBS, and Countrywide Securities made statements about the underwriting guidelines of Countrywide Home Loans, Inc. All of those statements are incorporated herein by reference.

One of these statements was that: "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." CWALT 2006-30T1 Pros. Sup. S-55.

Another one of these statements was that: "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower." CWALT 2006-30T1 Pros. Sup. S-56.

**Item 90. 90+ days delinquencies:**

    **(a) Number of the mortgage loans that suffered 90+ days delinquencies:** 327

    **(b) Percent of the mortgage loans that suffered 90+ days delinquencies:** 44.2%

**Item 91. 30+ days delinquencies:**

    **(a) Number of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 264

**(b)  Percent of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 35.7%

## Item 100. Statements about the ratings of the certificate(s) that Colonial purchased:

On pages S-7 through S-8 and S-133 through S-134 of the prospectus supplement, CWALT, RBS, and Countrywide Securities made statements about the ratings assigned to the certificates issued in this securitization. CWALT, RBS, and Countrywide Securities stated that Colonial's Class 1-A-5 certificate was rated AAA by Fitch Ratings and Aaa by Moody's Investors Service, Inc.; and that Colonial's Class 2-A-6 certificate was rated AAA by Fitch Ratings, AAA by Standard & Poor's Rating Services, and Aaa by Moody's Investors Service, Inc. CWALT 2006-30T1 Pros. Sup. S-7. These were the highest ratings available from these rating agencies.

CWALT, RBS, and Countrywide Securities also stated: "The offered certificates will not be offered unless they are assigned the indicated ratings by Fitch Ratings . . . Moody's Investors Service, Inc. . . and Standard & Poor's Rating Services. . . ." CWALT 2006-30T1 Pros. Sup. S-8.

CWALT, RBS, and Countrywide Securities also stated: "It is a condition to the issuance of the offered certificates that they be assigned the respective ratings set forth in the Summary of this

prospectus supplement." CWALT 2006-30T1 Pros. Sup. S-133.

Item 103. Summary of loans about which the defendants made untrue or misleading statements:

   (a) Number of loans whose LTVs were materially understated as shown by the AVM: 302

   (b) Number of loans for which the properties were stated to be owner-occupied but were not: 192

   (c) Eliminating duplicates, number of loans about which the defendants made untrue or misleading statements: 430

   (d) Eliminating duplicates, percent of loans about which the defendants made untrue or misleading statements: 51.2%

## SCHEDULE 3 OF THE COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the complaint, those allegations are made against defendants CWALT, Credit Suisse, Countrywide Securities, CFC, and BAC.

**Item 34. Details of trust and certificate(s).**

**(a) Dealer that sold the certificate(s) to Colonial:** Credit Suisse.

**(b) Description of the trust:** Alternative Loan Trust, Mortgage Pass-Through Certificates, Series 2007-18CB was a securitization in June 2007 of 3,026 mortgage loans, in two groups. CWALT was the issuer of the securities in the trust. The mortgage loans in the collateral pool of this securitization were originated or acquired by Countrywide Home Loans, Inc. CWALT 2007-18CB Pros. Sup. S-4, S-39.

**(c) Description of the certificate(s) that Colonial purchased:** Credit Suisse and Countrywide Securities were the underwriters of the security that Colonial purchased. Credit Suisse offered and sold to Colonial a senior certificate in this securitization, in class 2-A-20, for which Colonial paid $33,807,130 plus accrued interest on August 24, 2007. Colonial's certificate was primarily paid by the 1,791 mortgage loans in loan group 2.

**(d) Ratings of the certificate(s) when Colonial purchased them:** Fitch: AAA; S&P: AAA.

(e) **Current ratings of the certificate(s)**: Fitch: D; S&P: D.

(f) **Date on which the certificate(s) were downgraded below investment grade**: December 16, 2008.

(g) **URL of prospectus supplement for this securitization**: http://www.sec.gov/Archives/edgar/data/1269518/000136231007 001246/c70729e424b5.htm.

(h) **Registration statement pursuant or traceable to which the certificate(s) were issued**: Certificates in this trust, including the certificate that Colonial purchased, were issued pursuant or traceable to a registration statement filed by CWALT with the SEC on form S-3 on February 28, 2007. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

## Item 43. Untrue or misleading statements about the LTVs of the mortgage loans:

In the prospectus supplement, CWALT, Credit Suisse, and Countrywide Securities made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a) The weighted-average Original LTV Ratio of the mortgage loans in loan group 2 was 70.14%. CWALT 2007-18CB Pros. Sup. S-5.

(b) "No mortgage loan in any loan group had a Loan-to-Value Ratio at origination or on the closing date of more than 100%." CWALT 2007-18CB Pros. Sup. S-35.

(c) In Annex A of the prospectus supplement entitled "The Mortgage Pool", CWALT, Credit Suisse, and Countrywide Securities presented tables of statistics about the mortgage loans in the collateral pool. CWALT 2007-18CB Pros. Sup. A-1 to A-19. Each table focused on a certain characteristic of the loans (for example, current mortgage loan principal balance) and divided the loans into categories based on that characteristic (for example, loans with a range of current mortgage loan principal balances of $0.01 to $50,000.00, $50,000.01 to $100,000.00, $100,000.01 to $150,000.00, etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted Average Original Loan-to-Value Ratio." There were 13 such tables in Annex A for the mortgage loans in loan group 2. In each table, the number of categories into which the loans were divided ranged from 3 to 41. Thus, in Annex A, CWALT, Credit Suisse, and Countrywide Securities made many untrue or misleading statements about the original LTVs of the loans in loan group 2. CWALT 2007-18CB Pros. Sup. A-1 to A-19.

(d) "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the mortgage loans in loan group 2 was approximately 70.14%." CWALT 2007-18CB Pros. Sup. A-14.

**SCHEDULE 3 OF THE COMPLAINT**                    **Page 3**

(e) "As of the cut-off date, the weighted average original Combined Loan-to-Value Ratio of the mortgage loans in loan group 2 was approximately 71.90%." CWALT 2007-18CB Pros. Sup. A-15.

**Item 52. Details of the results of the AVM analysis for the loans that backed the certificate:**

| | |
|---|---:|
| Number of loans that backed the certificate (loan group 2) | 1,791 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 654 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $45,769,050 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 134 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $8,836,291 |
| Number of loans with LTVs over 100%, as stated by defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 103 |
| Weighted-average LTV, as stated by defendants | 70.14% |
| Weighted-average LTV, as determined by the model | 78.8% |

**Item 67. Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, CWALT, Credit Suisse, and Countrywide Securities made the following statement about the appraisals of the properties that secured the mortgage loans: "All appraisals are required to conform to Fannie

Mae or Freddie Mac appraisal standards then in effect."
CWALT 2007-18CB Pros. Sup. S-41.

## Item 73. Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:

In the prospectus supplement, CWALT, Credit Suisse, and Countrywide Securities made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a) In Annex A of the prospectus supplement, described in Item 43, CWALT, Credit Suisse, and Countrywide Securities presented a table entitled "Occupancy Types." This table divided the mortgage loans in loan group 2 into the categories "Primary Residence," "Investment Property," and "Secondary Residence." The table contained untrue or misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. CWALT 2007-18CB Pros. Sup. A-17.

(b) In the "Occupancy Types" table, CWALT, Credit Suisse, and Countrywide Securities stated that of 1,791 mortgage loans in loan group 2, 1,450 were secured by primary residences, and 341 were not. CWALT 2007-18CB Pros. Sup. A-17.

**Item 80.** **Details of properties in loan group 2 that were stated to be owner-occupied, but were not:**

    **(a)** **Number of loans for which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address:** 166

    **(b)** **Number of loans for which the owner of the property could have, but did not, designate the property as his or her homestead:** 228

    **(c)** **Number of loans for which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address:** 206

    **(d)** **Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true:** 484

**Item 83.** **Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-39 to S-44 of the prospectus supplement, CWALT, Credit Suisse, and Countrywide Securities made statements about the underwriting guidelines of Countrywide Home Loans, Inc., which originated or acquired all of the mortgage loans in the collateral pool of this securitization. All of those statements are incorporated herein by reference.

(a) One of those statements was that: "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." CWALT 2007-18CB Pros. Sup. S-40.

(b) Another one of those statements was that: "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower." CWALT 2007-18CB Pros. Sup. S-40.

**Item 89. Early payment defaults in loan group 2:**

    **(a) Number of the mortgage loans that suffered EPDs:** 8

    **(b) Percent of the mortgage loans that suffered EPDs:** 0.45%

**Item 90. 90+ days delinquencies in loan group 2:**

    **(a) Number of the mortgage loans that suffered 90+ days delinquencies:** 446

    **(b) Percent of the mortgage loans that suffered 90+ days delinquencies:** 24.9%

**Item 91. 30+ days delinquencies in loan group 2:**

    **(a) Number of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 361

    **(b) Percent of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 20.2%

**Item 100. Statements about the ratings of the certificate(s) that Colonial purchased:**

On page S-6 through S-9 and S-118 of the prospectus supplement, CWALT, Credit Suisse, and Countrywide Securities made statements about the ratings assigned to the certificates issued in this securitization. CWALT, Credit Suisse, and Countrywide Securities stated that Colonial's certificate was rated AAA by Fitch Ratings and AAA by Standard & Poor's Rating Services. These were the highest ratings available from these two rating agencies.

CWALT, Credit Suisse, and Countrywide Securities also stated: "The offered certificates will not be offered unless they are assigned the indicated ratings by Fitch Ratings. . .[and] Standard & Poor's . . . ." CWALT 2007-18CB Pros. Sup. S-9.

CWALT, Credit Suisse, and Countrywide Securities also stated: "It is a condition to the issuance of the offered certificates that they be assigned the respective ratings set forth in the Summary of this prospectus supplement." CWALT 2007-18CB Pros. Sup. S-118.

Item 103. Summary of loans in loan group 2 about which the defendants made untrue or misleading statements:

(a) Number of loans whose LTVs were materially understated as shown by the AVM: 654

(b) Number of loans for which the properties were stated to be owner-occupied but were not: 484

(c) Number of loans that suffered EPDs: 8

(d) Eliminating duplicates, number of loans about which the defendants made untrue or misleading statements: 927

(e) Eliminating duplicates, percent of loans about which the defendants made untrue or misleading statements: 51.8%

## SCHEDULE 4 OF THE COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the Complaint, those allegations are made against defendants CWALT, Morgan Stanley, UBS, CFC, and BAC.

**Item 34. Details of trust and certificate(s).**

**Dealer that sold the certificate(s) to Colonial**: UBS.

**(a) Description of the trust**: Alternative Loan Trust, Mortgage Pass-Through Certificates, Series 2005-74T1 was a securitization in November 2005 of 572 mortgage loans in one pool. CWALT was the issuer of the securities in the trust. The mortgage loans in the collateral pool of this securitization were originated or acquired by Countrywide Home Loans, Inc. CWALT 2005-74T1 Pros. Sup. S-3, S-23.

**(b) Description of the certificate(s) that Colonial purchased**: Morgan Stanley and UBS were the underwriters of the securities that Colonial purchased. UBS offered and sold to Colonial a senior certificate in this securitization, in class A-1, for which Colonial paid $49,086,642 plus accrued interest on February 16, 2006. Colonial also purchased a senior certificate in this securitization, in class A-5, for which Colonial paid $16,238,625 plus accrued interest on June 26, 2007.

**(c) Ratings of the certificate(s) when Colonial purchased them**: Class A-1: S&P: AAA; Fitch: AAA. Class A-5: S&P: AAA; Fitch: AAA.

**(d) Current ratings of the certificate(s):** Class A-1 S&P: CCC; Fitch: C. Class A-5: S&P: CCC; Fitch: C.

**(e) Date on which the certificate(s) were downgraded below investment grade:** Class A-1: July 24, 2009. Class A-5: July 24, 2009.

**(f) URL of prospectus supplement for this securitization:**

http://www.sec.gov/Archives/edgar/data/1269518/00009501 2905011413/v14713e424b5.txt

**(g) Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificates that Colonial purchased, were issued pursuant or traceable to a registration statement filed by CWALT with the SEC on form S-3 on June 17, 2005. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

## Item 43. Untrue or misleading statements about the LTVs of the mortgage loans:

In the prospectus supplement, CWALT, Morgan Stanley, and UBS made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a) "No mortgage loan had a Loan-to-Value Ratio at origination of more than 90.00%." CWALT 2005-74T1 Pros. Sup. S-13.

(b) In the section of the prospectus supplement entitled "The Mortgage Pool," CWALT, Morgan Stanley, and UBS presented tables of statistics about the mortgage loans in the collateral pool. Each table focused on a certain characteristic of the loans (for example, current principal balance) and divided the loans into categories based on that characteristic (for example, loans with current principal balances of $400,000.01 to $450,000.00, $450,000.01 to $500,000.00, etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted Average Original Loan-to-Value Ratio." There were 10 such tables in "The Mortgage Pool" section for the loans in the collateral pool. In each table the number of categories into which the loans were divided ranged from 3 to 26. Thus, in "The Mortgage Pool" section, CWALT, Morgan Stanley, and UBS made many untrue or misleading statements about the original LTVs of the loans in the collateral pool. CWALT 2005-74T1 Pros. Sup. S-15 to S-21.

(c) "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the mortgage loans was approximately 70.71%." CWALT 2005-74T1 Pros. Sup. S-18.

**Item 52.  Details of the results of the AVM analysis for the loans that backed the certificates:**

| | |
|---|---:|
| Number of loans that backed the certificates | 572 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 206 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $47,224,563 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 41 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $6,262,656 |
| Number of loans with LTVs over 90%, as stated by defendants | 0 |
| Number of loans with LTVs over 90%, as determined by the model | 69 |
| Weighted-average LTV, as stated by defendants | 70.71% |
| Weighted-average LTV, as determined by the model | 90.4% |

**Item 58.  Undisclosed additional liens:**

   (a) **Minimum number of properties with additional liens:** 142

   (b) **Weighted average CLTV with additional liens:** 74.8%

**Item 67.  Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, CWALT, Morgan Stanley, and UBS made the following statement about the appraisals of the properties that secured the mortgage loans originated or acquired by Countrywide Home Loans, Inc.:

**SCHEDULE 4 OF THE COMPLAINT**                                    **Page 4**

"All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect." CWALT 2005-74T1 Pros. Sup. S-25.

## Item 73. Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:

In the prospectus supplement, CWALT, Morgan Stanley, and UBS made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a) In "The Mortgage Pool" section of the prospectus supplement, described in Item 43, CWALT, Morgan Stanley, and UBS presented a table entitled "Occupancy Types." This table divided all of the mortgage loans into the categories "Primary Residence," "Investment Property," and "Secondary Residence." This table contained untrue or misleading statements about, among other data, the number of mortgage loans, the aggregate principal balance outstanding, and the percent of mortgage loans in each of these categories. CWALT 2005-74T1 Pros. Sup. S-20.

(b) In the "Occupancy Types" table, CWALT, Morgan Stanley, and UBS stated that of the 572 mortgage loans in the collateral pool, 513 were secured by primary residences and 59 were not. CWALT 2005-74T1 Pros. Sup. S-20.

**Item 80. Details of properties that were stated to be owner-occupied, but were not:**

    **(a)** Number of loans for which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 49

    **(b)** Number of loans for which the owner of the property could have, but did not, designate the property as his or her homestead: 112

    **(c)** Number of loans for which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address: 54

    **(d)** Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true: 173

**Item 83. Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-23 through S-28 of the prospectus supplement, CWALT, Morgan Stanley, and UBS made statements about the underwriting guidelines of Countrywide Home Loans, Inc. All of those statements are incorporated herein by reference.

One of these statements was that: "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." CWALT 2005-74T1 Pros. Sup. S-24.

Another one of these statements was that: "Exceptions to Countrywide Home Loans' underwriting guidelines may be

made if compensating factors are demonstrated by a prospective borrower." CWALT 2005-74T1 Pros. Sup. S-24.

**Item 90. 90+ days delinquencies:**

    **(a) Number of the mortgage loans that suffered 90+ days delinquencies:** 197

    **(b) Percent of the mortgage loans that suffered 90+ days delinquencies:** 34%

**Item 91. 30+ days delinquencies:**

    **(a) Number of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 154

    **(b) Percent of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 27%

**Item 100. Statements about the ratings of the certificate(s) that Colonial purchased:**

On pages S-3 and S-62 of the prospectus supplement, CWALT, Morgan Stanley, and UBS made statements about the ratings assigned to the certificates issued in this securitization. CWALT, Morgan Stanley, and UBS stated that Colonial's certificates were rated AAA by Standard & Poor's and AAA by Fitch. CWALT 2005-74T1 Pros. Sup. S-3.

CWALT, Morgan Stanley, and UBS also stated: "The classes of certificates listed below will not be offered unless they are assigned the following ratings by Standard and Poor's Ratings Services...and Fitch Ratings." CWALT 2005-74T1 Pros. Sup. S-3.

CWALT, Morgan Stanley, and UBS also stated: "It is a condition to the issuance of the senior certificates that

they be rated at least 'AAA' each by Standard & Poor's. . .

and Fitch Ratings . . . ." CWALT 2005-74T1 Pros. Sup. S-62.

**Item 103.** Summary of loans about which the defendants made untrue or misleading statements:

    **(a)** **Number of loans whose LTVs were materially understated as shown by the AVM:** 206

    **(b)** **Number of loans in whose LTVs were misleading because of undisclosed additional liens:** 142

    **(c)** **Number of loans for which the properties were stated to be owner-occupied but were not:** 173

    **(d)** **Eliminating duplicates, number of loans about which the defendants made untrue or misleading statements:** 389

    **(e)** **Eliminating duplicates, percent of loans about which the defendants made untrue or misleading statements:** 68.0%

## SCHEDULE 5 OF THE COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the Complaint, those allegations are made against defendants CWALT, Citigroup, Morgan Stanley, CFC, and BAC.

**Item 34. Details of trust and certificate(s).**

**(a) Dealer that sold the certificate(s) to Colonial:** Citigroup.

**(b) Description of the trust**: Alternative Loan Trust, Mortgage Pass-Through Certificates, Series 2006-28CB was a securitization in August 2006 of 2,594 mortgage loans in one pool. CWALT was the issuer of the securities in the trust. The mortgage loans in the collateral pool of this securitization were originated or acquired by Countrywide Home Loans, Inc. CWALT 2006-28CB Pros. Sup. S-40.

**(c) Description of the certificate(s) that Colonial purchased**: Citigroup and Morgan Stanley were the underwriters of the securities that Colonial purchased. Citigroup offered and sold to Colonial a senior certificate in this securitization, in class A-14, for which Colonial paid $35,272,951 plus accrued interest on October 12, 2006, and a senior certificate in class A-4, for which Colonial paid $13,409,008 plus accrued interest on October 18, 2006.

**(d) Ratings of the certificate(s) when Colonial purchased them:** Class A-14: Fitch: AAA; Moody's: Aaa; S&P: AAA. Class A-4: Fitch: AAA; Moody's: Aaa; S&P: AAA.

**(e) Current ratings of the certificate(s)**: Class A-14: Fitch: CC; Moody's: Caa3; S&P: CCC. Class A-4: Fitch: D; Moody's: Caa3; S&P: D.

**(f) Date on which the certificate(s) were downgraded below investment grade**: Class A-14: February 20, 2009. Class A-4: October 14, 2008.

**(g) URL of prospectus supplement for this securitization**:
http://www.sec.gov/Archives/edgar/data/1269518/000095012406 005004/v23273b5e424b5.txt

**(h) Registration statement pursuant or traceable to which the certificate(s) were issued**: Certificates in this trust, including the certificates that Colonial purchased, were issued pursuant or traceable to a registration statement filed by CWALT with the SEC on form S-3 on February 7, 2006. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

## Item 43. Untrue or misleading statements about the LTVs of the mortgage loans:

In the prospectus supplement, CWALT, Citigroup, and Morgan Stanley made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a) As of the cut-off date, the weighted-average original LTV ratio of all of the loans in the collateral pool was 69.82%. CWALT 2006-28CB Pros. Sup. S-5.

(b) "No mortgage loan had a Loan-to-Value Ratio at origination of more than 95%." CWALT 2006-28CB Pros. Sup. S-28.

(c) In the section of the prospectus supplement entitled "The Mortgage Pool," CWALT, Citigroup, and Morgan Stanley presented tables of statistics about the mortgage loans in the collateral pool. Each table focused on a certain characteristic of the loans (for example, current principal balance) and divided the loans into categories based on that characteristic (for example, loans with current principal balances of $0.01 to $50,000.00, $50,000.01 to $100,000.00, $100,000.01 to $150,000.00, etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted Average Original Loan-to-Value Ratio." There were 12 such tables in "The Mortgage Pool" section for all of the loans in the collateral pool. In each table the number of categories into which the loans were divided ranged from 3 to 32. Thus, in "The Mortgage Pool" section, CWALT, Citigroup, and Morgan Stanley made many untrue or misleading statements about the original LTVs of all of the loans in the collateral pool. CWALT 2006-28CB Pros. Sup. S-31 to S-38.

(d) "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the mortgage loans was approximately 69.82%." CWALT 2006-28CB Pros. Sup. S-34.

**Item 52. Details of the results of the AVM analysis for the loans that backed the certificate:**

| | |
|---|---|
| Number of loans that backed the certificate | 2,594 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 817 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $46,549,031 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 246 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $12,784,194 |
| Number of loans with LTVs over 95%, as stated by defendants | 0 |
| Number of loans with LTVs over 95%, as determined by the model | 162 |
| Weighted-average LTV, as stated by defendants | 69.82% |
| Weighted-average LTV, as determined by the model | 78.0% |

**Item 58. Undisclosed additional liens:**

   **(a) Minimum number of properties with additional liens:** 804

   **(b) Weighted-average CLTV with additional liens:** 74.1%

**Item 67. Untrue or misleading statements about compliance with USPAP:**

   In the prospectus supplement, CWALT, Citigroup, and Morgan Stanley made the following statement about the

appraisals of the properties that secured the mortgage loans originated or acquired by Countrywide Home Loans, Inc.: "All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect." CWALT 2006-28CB Pros. Sup. S-42.

## Item 73. Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:

In the prospectus supplement, CWALT, Citigroup, and Morgan Stanley made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a) In "The Mortgage Pool" section of the prospectus supplement, described in Item 43, CWALT, Citigroup, and Morgan Stanley presented a table entitled "Occupancy Types." This table divided all of the mortgage loans in the collateral pool into the categories "Primary Residence," "Investment Property," and "Secondary Residence." This table contained untrue or misleading statements about, among other data, the number of mortgage loans, the aggregate principal balance outstanding, and the percent of mortgage loans in each of these categories. CWALT 2006-28CB Pros. Sup. S-36.

(b) In the "Occupancy Types" table, CWALT, Citigroup, and Morgan Stanley stated that of the 2,594 mortgage loans in the collateral pool, 2,156 were secured by primary

residences and 438 were not. CWALT 2006-28CB Pros. Sup. S-36.

**Item 80. Details of properties that were stated to be owner-occupied, but were not:**

    **(a) Number of loans for which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address:** 305

    **(b) Number of loans for which the owner of the property could have, but did not, designate the property as his or her homestead:** 292

    **(c) Number of loans for which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address:** 246

    **(d) Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true:** 674

**Item 83. Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-40 through S-45 of the prospectus supplement, CWALT, Citigroup, and Morgan Stanley made statements about the underwriting guidelines of Countrywide Home Loans, Inc. All of those statements are incorporated herein by reference.

One of these statements was that: "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." CWALT 2006-28CB Pros. Sup. S-41.

Another one of these statements was that: "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower." CWALT 2006-28CB Pros. Sup. S-41.

**Item 89. Early payment defaults:**

    **(a) Number of the mortgage loans that suffered EPDs:** 19

    **(b) Percent of the mortgage loans that suffered EPDs:** 0.7%

**Item 90. 90+ days delinquencies:**

    **(a) Number of the mortgage loans that suffered 90+ days delinquencies:** 736

    **(b) Percent of the mortgage loans that suffered 90+ days delinquencies:** 28.4%

**Item 91. 30+ days delinquencies:**

    **(a) Number of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 624

    **(b) Percent of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 24.0%

**Item 100. Statements about the ratings of the certificate(s) that Colonial purchased:**

On pages S-6 through S-7 and S-109 through S-110 of the prospectus supplement, CWALT, Citigroup, and Morgan Stanley made statements about the ratings assigned to the certificates issued in this securitization. CWALT, Citigroup, and Morgan Stanley stated that Colonial's certificates were rated AAA by Fitch Ratings, Aaa by Moody's Investors Service, Inc., and AAA by Standard &

Poor's.  CWALT 2006-28CB Pros. Sup. S-6.  These were the highest ratings available from these three rating agencies.

CWALT, Citigroup, and Morgan Stanley also stated: "The offered certificates will not be offered unless they are assigned the indicated ratings by Fitch Ratings . . . Moody's Investors Service, Inc. . . . and Standard & Poor's . . ." CWALT 2006-28CB Pros. Sup. S-7.

CWALT, Citigroup, and Morgan Stanley also stated: "It is a condition to the issuance of the offered certificates that they be assigned the respective ratings set forth in the Summary of this prospectus supplement." CWALT 2006-28CB Pros. Sup. S-109.

**Item 103. Summary of loans about which the defendants made untrue or misleading statements:**

(a) **Number of loans whose LTVs were materially understated as shown by the AVM:** 817

(b) **Number of loans in whose LTVs were misleading because of undisclosed additional liens:** 804

(c) **Number of loans for which the properties were stated to be owner-occupied but were not:** 674

(d) **Number of loans that suffered EPDs:** 19

(e) **Eliminating duplicates, number of loans about which the defendants made untrue or misleading statements:** 1,706

(f) **Eliminating duplicates, percent of loans about which the defendants made untrue or misleading statements:** 65.8%

## SCHEDULE 6 OF THE COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the Complaint, those allegations are made against defendants CWALT, Bear Stearns, JP Morgan, CFC, and BAC.

## Item 34. Details of trust and certificate(s).

**(a) Description of the trust:** Alternative Loan Trust, Mortgage Pass-Through Certificates, Series 2005-46CB was a securitization in August 2005 of 6,027 mortgage loans, in one pool.[3] CWALT was the issuer of the securities in the trust. The mortgage loans in the collateral pool of this securitization were originated or acquired by Countrywide Home Loans, Inc. CWALT 2005-46CB Pros. Sup. S-4, S-27.

**(b) Description of the certificate(s) that Colonial purchased:** Bear Stearns and JP Morgan were the underwriters of the security that Colonial purchased. Colonial purchased a senior certificate in this securitization, in class A-14, for which Colonial paid $23,938,573 plus accrued interest on January 12, 2006.

---

[3] CWALT 2005-46CB was a securitization with a supplemental loan account that enabled it to purchase additional mortgage loans. CWALT 2005-46CB Pros. Sup. S-5,S-15. On the closing date of the securitization there were 6,027 mortgage loans in the trust (the "Initial Mortgage Loans"). After the closing date of the securitization, the trust purchased an additional 330 mortgage loans. The data contained in the charts and tables in this schedule include the additional 330 mortgage loans, unless otherwise indicated.

**(c) Ratings of the certificate(s) when Colonial purchased them**: Fitch: AAA; Moody's: Aaa.

**(d) Current ratings of the certificate(s)**: Fitch: C; Moody's: Caa2.

**(e) Date on which the certificate(s) were downgraded below investment grade**: February 20, 2009.

**(f) URL of prospectus supplement for this securitization**:
http://www.sec.gov/Archives/edgar/data/1269518/000095012905
008886/v11891e424b5.txt

**(g) Registration statement pursuant or traceable to which the certificate(s) were issued**: Certificates in this trust, including the certificate that Colonial purchased, were issued pursuant or traceable to a registration statement filed by CWALT with the SEC on form S-3 on June 17, 2005. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

**Item 43. Untrue or misleading statements about the LTVs of the mortgage loans**:

In the prospectus supplement, CWALT, Bear Stearns, and JP Morgan made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a) "No Initial Mortgage Loan had a Loan-to-Value Ratio at origination of more than 100.00%." CWALT 2005-46CB Pros. Sup. S-15.

(b) In the section of the prospectus supplement entitled "The Mortgage Pool," CWALT, Bear Stearns, and JP Morgan presented tables of statistics about the Initial Mortgage Loans in the collateral pool. Each table focused on a certain characteristic of the loans (for example, current principal balance) and divided the loans into categories based on that characteristic (for example, loans with current principal balances of $0.01 to $50,000.00, $50,000.01 to $100,000.00, $100,000.01 to $150,000.00, etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted Average Original Loan-to-Value Ratio." There were 10 such tables in "The Mortgage Pool" section for the Initial Mortgage Loans in the collateral pool. In each table the number of categories into which the Initial Mortgage Loans were divided ranged from 3 to 53. Thus, in "The Mortgage Pool" section, CWALT, Bear Stearns, and JP Morgan made many untrue or misleading statements about the original LTVs of the Initial Mortgage Loans in the collateral pool. CWALT 2005-46CB Pros. Sup. S-17 to S-24.

(c) "As of the initial cut-off date, the weighted average original Loan-to-Value Ratio of the Initial Mortgage Loans was approximately 71.79%." CWALT 2005-46CB Pros. Sup. S-21.

**SCHEDULE 6 OF THE COMPLAINT**                                    **Page 3**

**Item 52. Details of the results of the AVM analysis for the loans that backed the certificate:**

| | |
|---|---:|
| Number of loans that backed the certificate | 6,357 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 1,764 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $76,732,948 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 779 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $37,958,872 |
| Number of loans with LTVs over 100%, as stated by defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 318 |
| Weighted-average LTV, as stated by defendants | 71.79% |
| Weighted-average LTV, as determined by the model | 78.5% |

**Item 58. Undisclosed additional liens:**

    (a) **Minimum number of properties with additional liens:** 1,844

    (b) **Weighted-average CLTV with additional liens:** 76.8%

**Item 67. Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, CWALT, Bear Stearns, and JP Morgan made the following statement about the appraisals of the properties that secured the mortgage loans originated or acquired by Countrywide Home Loans: "All

**SCHEDULE 6 OF THE COMPLAINT**            **Page 4**

appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect." CWALT 2005-46CB Pros. Sup. S-29.

**Item 73. Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, CWALT, Bear Stearns, and JP Morgan made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a) In "The Mortgage Pool" section of the prospectus supplement, described in Item 43, CWALT, Bear Stearns, and JP Morgan presented a table entitled "Occupancy Types." This table divided the Initial Mortgage Loans in the collateral pool into the categories "Primary Residence," "Investment Property," and "Secondary Residence." This table contained untrue or misleading statements about, among other data, the number of Initial Mortgage Loans, the aggregate principal balance outstanding, and the percent of the Initial Mortgage Loans in each of these categories. CWALT 2005-46CB Pros. Sup. S-23.

(b) In the "Occupancy Types" table, CWALT, Bear Stearns, and JP Morgan stated that of the 6,027 Initial Mortgage Loans in the collateral pool, 4,966 were secured by primary residences, and 1,061 were not. CWALT 2005-46CB Pros. Sup. S-23.

**Item 80. Details of properties that were stated to be owner-occupied, but were not:**

    **(a)** Number of loans for which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 429

    **(b)** Number of loans for which the owner of the property could have, but did not, designate the property as his or her homestead: 811

    **(c)** Number of loans for which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address: 493

    **(d)** Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true: 1,462

**Item 83. Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-27 through S-32 of the prospectus supplement, CWALT, Bear Stearns, and JP Morgan made statements about the underwriting guidelines of Countrywide Home Loans, Inc. All of those statements are incorporated herein by reference.

One of these statements was that: "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." CWALT 2005-46CB Pros. Sup. S-28.

Another one of these statements was that: "Exceptions to Countrywide Home Loans' underwriting guidelines may be

made if compensating factors are demonstrated by a prospective borrower." CWALT 2005-46CB Pros. Sup. S-28.

**Item 89. Early payment defaults:**

    **(a) Number of the mortgage loans that suffered EPDs:** 19

    **(b) Percent of the mortgage loans that suffered EPDs:** 0.3%

**Item 90. 90+ days delinquencies:**

    **(a) Number of the mortgage loans that suffered 90+ days delinquencies:** 984

    **(b) Percent of the mortgage loans that suffered 90+ days delinquencies:** 15.5%

**Item 91. 30+ days delinquencies:**

    **(a) Number of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 866

    **(b) Percent of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 13.6%

**Item 100. Statements about the ratings of the certificate(s) that Colonial purchased:**

On pages S-3 and S-80 through S-81 of the prospectus supplement, CWALT, Bear Stearns, and JP Morgan made statements about the ratings assigned to the certificates issued in this securitization. CWALT, Bear Stearns, and JP Morgan stated that Colonial's certificate was rated AAA by Fitch Ratings and Aaa by Moody's Investors Service, Inc. These were the highest ratings available from these two rating agencies.

CWALT, Bear Stearns, and JP Morgan also stated: "The classes of certificates listed below will not be offered

unless they are assigned the following ratings by Fitch, Inc. . . . [and]. . . Moody's Investors Service, Inc." CWALT 2005-46B Pros. Sup. S-3.

CWALT, Bear Stearns, and JP Morgan also stated: "It is a condition to the issuance of the senior certificates that they be rated 'AAA' by Fitch Ratings, Inc. . . . and 'Aaa' by Moody's Investors Service, Inc. . . . " CWALT 2005-46CB Pros. Sup. S-80.

**Item 103. Summary of loans about which the defendants made untrue or misleading statements:**

    **(a) Number of loans whose LTVs were materially understated as shown by the AVM:** 1,764

    **(b) Number of loans whose LTVs were misleading because of undisclosed additional liens:** 1,844

    **(c) Number of loans for which the properties were stated to be owner-occupied but were not:** 1,462

    **(d) Number of loans that suffered EPDs:** 19

    **(e) Eliminating duplicates, number of loans about which the defendants made untrue or misleading statements:** 3,941

    **(f) Eliminating duplicates, percent of loans about which the defendants made untrue or misleading statements:** 62.0%

## SCHEDULE 7 OF THE COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the Complaint, those allegations are made against defendants CWALT, JP Morgan, UBS, CFC, and BAC.

**Item 34. Details of trust and certificate(s).**

**(a) Description of the trust**: Alternative Loan Trust, Mortgage Pass-Through Certificates, Series 2006-12CB was a securitization in March 2006 of 2,853 mortgage loans, in one pool.[4] CWALT was the issuer of the securities in the trust. The mortgage loans in the collateral pool of this securitization were originated or acquired by Countrywide Home Loans, Inc. CWALT 2006-12CB Pros. Sup. S-3 to S-4, S-39.

**(b) Description of the certificate(s) that Colonial purchased**: JP Morgan and UBS were the underwriters of the security that Colonial purchased. Colonial purchased one senior certificate in this securitization, in class A-8,

---

[4] CWALT 2006-12CB was a prefunded securitization. CWALT 2006-12CB Pros. Sup. S-3 to S-4. On the closing date of the securitization there were 2,853 mortgage loans in the trust (the "Initial Mortgage Loans"). CWALT 2006-12CB Pros. Sup. S-23, S-29. After the closing date of the securitization, the trust purchased an additional 217 mortgage loans. The data contained in the charts and tables in this schedule include those additional 217 mortgage loans that were added to the trust, unless otherwise indicated.

for which Colonial paid $14,326,980 plus accrued interest on October 4, 2007.

**(c) Ratings of the certificate(s) when Colonial purchased them**: Moody's: Aaa; Fitch: AAA.

**(d) Current ratings of the certificate(s)**: Moody's: Caa3; Fitch: D.

**(e) Date on which the certificate(s) were downgraded below investment grade**: December 17, 2008.

**(f) URL of prospectus supplement for this securitization**:
http://sec.gov/Archives/edgar/data/1269518/00009501360600 2668/file001.htm

**(g) Registration statement pursuant or traceable to which the certificate(s) were issued**: Certificates in this trust, including the certificate that Colonial purchased, were issued pursuant or traceable to a registration statement filed by CWALT with the SEC on form S-3 on February 7, 2006. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

## Item 43. Untrue or misleading statements about the LTVs of the mortgage loans:

In the prospectus supplement, CWALT, JP Morgan, and UBS made the following statements about the LTVs of the

mortgage loans in the collateral pool of this securitization.

(a) As of the initial cut-off date, the weighted average original LTV ratio of the Initial Mortgage Loans was 73.69%. CWALT 2006-12CB Pros. Sup. S-4.

(b) "Except for one Initial Mortgage Loan, no Initial Mortgage Loan had a Loan-to-Value Ratio at origination of more than 95.00%." CWALT 2006-12CB Pros. Sup. S-25.

(c) In the section of the prospectus supplement entitled "The Mortgage Pool," CWALT, JP Morgan, and UBS presented tables of statistics about the Initial Mortgage Loans in the collateral pool. Each table focused on a certain characteristic of the loans (for example, current principal balance) and divided the loans into categories based on that characteristic (for example, loans with current principal balances of $0.01 to $50,000.00, $50,000.01 to $100,000.00, $100,000.01 to $150,000.00, etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted Average Original Loan-to-Value Ratio." There were 12 such tables in "The Mortgage Pool" section for the Initial Mortgage Loans in the collateral pool. In each table the number of categories into which the loans were divided ranged from 3 to 37. Thus, in "The Mortgage Pool" section, CWALT, JP Morgan, and UBS made many untrue or misleading statements about the original LTVs of the

Initial Mortgage Loans in the collateral pool. CWALT 2006-12CB Pros. Sup. S-27 to S-35.

(d) "As of the initial cut-off date, the weighted average original Loan-to-Value Ratio of the Initial Mortgage Loans was approximately 73.69%." CWALT 2006-12CB Pros. Sup. S-31.

**Item 52. Details of the results of the AVM analysis for the loans that backed the certificate:**

| | |
|---|---:|
| Number of loans that backed the certificate | 3,070 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 952 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $45,866,784 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 345 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $27,248,379 |
| Number of loans with LTVs over 95%, as stated by defendants | 1 |
| Number of loans with LTVs over 95%, as determined by the model | 299 |
| Weighted-average LTV, as stated by defendants | 73.69% |
| Weighted-average LTV, as determined by the model | 82.7% |

**Item 58. Undisclosed additional liens:**

    **(a) Minimum number of properties with additional liens:** 1,051

**(b) Weighted average CLTV with additional liens:** 80.8%

## Item 67. Untrue or misleading statements about compliance with USPAP:

In the prospectus supplement, CWALT, JP Morgan, and UBS made the following statement about the appraisals of the properties that secured the mortgage loans originated or acquired by Countrywide Home Loans, Inc.: "All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect." CWALT 2006-12CB Pros. Sup. S-40.

## Item 73. Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:

In the prospectus supplement, CWALT, JP Morgan, and UBS made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a) In "The Mortgage Pool" section of the prospectus supplement, described in Item 43, CWALT, JP Morgan, and UBS presented a table entitled "Occupancy Types." This table divided the Initial Mortgage Loans in the collateral pool into the categories "Primary Residence," "Investment Property," and "Secondary Residence." This table contained untrue or misleading statements about, among other data, the number of Initial Mortgage Loans, the aggregate principal balance outstanding, and the

percent of the Initial Mortgage Loans in each of these categories. CWALT 2006-12CB Pros. Sup. S-33.

(b) In the "Occupancy Types" table, CWALT, JP Morgan, and UBS stated that of the 2,853 Initial Mortgage Loans in the collateral pool, 2,459 were secured by primary residences, and 394 were not. CWALT 2006-12CB Pros. Sup. S-33.

**Item 80. Details of properties that were stated to be owner-occupied, but were not:**

    **(a) Number of loans for which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address:** 361

    **(b) Number of loans for which the owner of the property could have, but did not, designate the property as his or her homestead:** 414

    **(c) Number of loans for which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address:** 215

    **(d) Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true:** 783

**Item 83. Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-39 through S-44 of the prospectus supplement, CWALT, JP Morgan, and UBS made statements about the underwriting guidelines of Countrywide Home Loans, Inc. All of those statements are incorporated herein by reference.

One of these statements was that: "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." CWALT 2006-12CB Pros. Sup. S-39.

Another one of these statements was that: "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower." CWALT 2006-12CB Pros. Sup. S-40.

**Item 89. Early payment defaults:**

    **(a) Number of the mortgage loans that suffered EPDs:** 12

    **(b) Percent of the mortgage loans that suffered EPDs:** 0.4%

**Item 90. 90+ days delinquencies:**

    **(a) Number of the mortgage loans that suffered 90+ days delinquencies:** 956

    **(b) Percent of the mortgage loans that suffered 90+ days delinquencies:** 31.1%

**Item 91. 30+ days delinquencies:**

    **(a) Number of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 843

    **(b) Percent of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 27.5%

**Item 100. Statements about the ratings of the certificate(s) that Colonial purchased:**

On pages S-5 through S-7 and S-97 of the prospectus supplement, CWALT, JP Morgan, and UBS made statements about the ratings assigned to the certificates issued in this securitization. CWALT, JP Morgan, and UBS stated that Colonial's certificate was rated Aaa by Moody's Investors Service, Inc., and AAA by Fitch Ratings. CWALT 2006-12CB Pros. Sup. S-5. These were the highest ratings available from these two rating agencies.

CWALT, JP Morgan, and UBS also stated: "The offered certificates will not be offered unless they are assigned the indicated ratings by Fitch Ratings . . . and by Moody's Investors Service, Inc. . . ." CWALT 2006-12CB Pros. Sup. S-6.

CWALT, JP Morgan, and UBS also stated: "It is a condition to the issuance of the senior certificates . . . that they be rated 'AAA' by Fitch Ratings . . . and 'Aaa' by Moody's Investors Service, Inc. . . ." CWALT 2006-12CB Pros. Sup. S-97.

**Item 103. Summary of loans about which the defendants made untrue or misleading statements:**

- **(a) Number of loans whose LTVs were materially understated as shown by the AVM**: 952

- **(b) Number of loans whose LTVs were misleading because of undisclosed additional liens**: 1,051

- **(c) Number of loans for which the properties were stated to be owner-occupied but were not**: 783

- **(d) Number of loans that suffered EPDs**: 12

(e) **Eliminating duplicates, number of loans about which the defendants made untrue or misleading statements:** 2,080

(f) **Eliminating duplicates, percent of loans about which the defendants made untrue or misleading statements:** 67.8%

## SCHEDULE 8 OF THE COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the Complaint, those allegations are made against defendants CWMBS, Credit Suisse, Morgan Stanley, CFC, and BAC.

**Item 34. Details of trust and certificate(s).**

**(a) Description of the trust**: CHL Mortgage Trust, Pass-Through Certificates, Series 2006-13 was a securitization in July 2006 of 832 mortgage loans in one pool. CWMBS was the issuer of the securities in the trust. The mortgage loans in the collateral pool of this securitization were originated or acquired by Countrywide Home Loans, Inc. CWHL 2006-13 Pros. Sup. S-37.

**(b) Description of the certificate(s) that Colonial purchased**: Credit Suisse and Morgan Stanley were the underwriters of the security that Colonial purchased. Colonial purchased a senior certificate in this securitization, in class 1-A-19, for which Colonial paid $11,819,776 plus accrued interest on August 15, 2007.

**(c) Ratings of the certificate(s) when Colonial purchased them**: Fitch: AAA; Standard & Poor's: AAA; Moody's: Aaa.

**(d) Current ratings of the certificate(s)**: Fitch: C; Standard & Poor's: CCC; Moody's: Caa2.

(e) **Date on which the certificate(s) were downgraded below investment grade**: March 24, 2009.

(f) **URL of prospectus supplement for this securitization**:

http://sec.gov/Archives/edgar/data/906410/0000950134060
14436/v22167b5e424b5.txt

(g) **Registration statement pursuant or traceable to which the certificate(s) were issued**: Certificates in this trust, including the certificate that Colonial purchased, were issued pursuant or traceable to a registration statement filed by CWMBS with the SEC on form S-3 on February 8, 2006. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

## Item 43. Untrue or misleading statements about the LTVs of the mortgage loans:

In the prospectus supplement, CWMBS, Credit Suisse, and Morgan Stanley made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a) The Weighted Average Original LTV Ratio of the mortgage loans in the mortgage pool was 73.17%. CWHL 2006-13 Pros. Sup. S-5.

(b) "No mortgage loan had a Loan-to-Value Ratio at origination or on the closing date of more than 95.00%." CWHL 2006-13 Pros. Sup. S-27.

(c) CWMBS, Credit Suisse, and Morgan Stanley presented a table entitled "Original Loan-to-Value Ratios." This table divided the loans in the collateral pool into 10 categories of original LTV (for example, 50.00% and below, 50.01% to 55.00%, 55.01% to 60.00%, 60.01% to 65.00%, etc.). The table contained untrue or misleading statements about the number of mortgage loans, the unpaid principal balance, and the percent of principal balance outstanding in each of these categories. CWHL 2006-13 Pros. Sup. S-31.

(d) "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the mortgage loans was approximately 73.17%." CWHL 2006-13 Pros. Sup. S-31.

**Item 52. Details of the results of the AVM analysis for the loans that backed the certificate:**

| | |
|---|---:|
| Number of loans that backed the certificate | 832 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 316 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $52,885,310 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 40 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $5,481,279 |
| Number of loans with LTVs over 95%, as stated by defendants | 0 |
| Number of loans with LTVs over 95%, as determined by the model | 89 |
| Weighted-average LTV, as stated by defendants | 73.17% |
| Weighted-average LTV, as determined by the model | 85.6% |

**Item 58. Undisclosed additional liens:**

    **(a)  Minimum number of properties with additional liens:** 281

    **(b)  Weighted average CLTV with additional liens:** 76.5%

**Item 67. Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, CWMBS, Credit Suisse, and Morgan Stanley made the following statement about the appraisals of the properties that secured the mortgage loans originated or acquired by Countrywide

Home Loans, Inc.: "All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect." CWHL 2006-13 Pros. Sup. S-39.

## Item 73. Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:

In the prospectus supplement, CWMBS, Credit Suisse, and Morgan Stanley made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a) CWMBS, Credit Suisse, and Morgan Stanley presented a table entitled "Occupancy Types." This table divided all of the mortgage loans in the collateral pool into the categories "Primary Residence" and "Secondary Residence." This table contained untrue or misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of mortgage loans in each of these categories. CWHL 2006-13 Pros. Sup. S-33.

(b) In the "Occupancy Types" table, CWMBS, Credit Suisse, and Morgan Stanley stated that of 832 mortgage loans in the collateral pool, 769 were secured by primary residences and 63 were not. CWHL 2006-13 Pros. Sup. S-33.

**Item 80. Details of properties that were stated to be owner-occupied, but were not:**

    (a) Number of loans for which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 42

    (b) Number of loans for which the owner of the property could have, but did not, designate the property as his or her homestead: 141

    (c) Number of loans for which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address: 37

    (d) Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true: 191

**Item 83. Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-37 through S-39 of the prospectus supplement, CWMBS, Credit Suisse, and Morgan Stanley made statements about the underwriting guidelines of Countrywide Home Loans, Inc. All of those statements are incorporated herein by reference.

One of these statements was that: "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." CWHL 2006-13 Pros. Sup. S-38.

Another one of these statements was that: "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are

demonstrated by a prospective borrower." CWHL 2006-13 Pros. Sup. S-38.

**Item 90.  90+ days delinquencies:**

    **(a) Number of the mortgage loans that suffered 90+ days delinquencies:** 173

    **(b) Percent of the mortgage loans that suffered 90+ days delinquencies:** 20.8%

**Item 91.  30+ days delinquencies:**

    **(a) Number of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 142

    **(b) Percent of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 17.1%

**Item 100. Statements about the ratings of the certificate(s) that Colonial purchased:**

On pages S-6 through S-7 and S-102 through S-103 of the prospectus supplement, CWMBS, Credit Suisse, and Morgan Stanley made statements about the ratings assigned to the certificates issued in this securitization. CWMBS, Credit Suisse, and Morgan Stanley stated that Colonial's certificate was rated AAA by Fitch Ratings, AAA by Standard & Poor's, and Aaa by Moody's. These were the highest ratings available from these three rating agencies.

CWMBS, Credit Suisse, and Morgan Stanley also stated: "The offered certificates will not be offered unless they are assigned the indicated ratings by Fitch Ratings . . . Moody's Investor Services, Inc. . . . and Standard & Poor's . . . ." CWHL 2006-13 Pros. Sup. S-7.

CWMBS, Credit Suisse, and Morgan Stanley also stated: "It is a condition to the issuance of the offered certificates that they be assigned the respective ratings set forth in the Summary of this prospectus supplement." CWHL 2006-13 Pros. Sup. S-102.

Item 103. **Summary of loans about which the defendants made untrue or misleading statements:**

   (a) **Number of loans whose LTVs were materially understated as shown by the AVM:** 316

   (b) **Number of loans whose LTVs were misleading because of undisclosed additional liens:** 281

   (c) **Number of loans for which the properties were stated to be owner-occupied but were not:** 191

   (d) **Eliminating duplicates, number of loans about which the defendants made untrue or misleading statements:** 572

   (e) **Eliminating duplicates, percent of loans about which the defendants made untrue or misleading statements:** 68.8%